# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | |
|---|---|
| **ANIA RYNARZEWSKA,** | |
| *Plaintiff,* | **CIVIL ACTION NO.** |
| **v.** | **5:22-cv-00398-TES** |
| **THE CORPORATION OF MERCER UNIVERSITY,** *doing business as* **MERCER UNIVERSITY,** | |
| *Defendant.* | |

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

After her first year of teaching at Mercer University's Stetson-Hatcher School of Business, a professor found her visiting professorship converted into one that could land her a coveted tenured spot on its faculty. Not unlike countless others in academia climbing the rungs, she steered field-relevant research, engaged in peer review, served in local and national clubs and organizations, and, of course, took pride in mentoring and teaching students. When the time came, this professor sought tenure, and for those unfamiliar with how that process works, when you go up for tenure, it's up or it's out. Either you're awarded a tenured position or you're out the door.

From this brief introduction alone, you can probably surmise that this professor was unsuccessful. Now, without pulling the proverbial curtain back too quickly, there's

no doubt that she shines in her respective field. As an accomplished professor, she understandably points to her past to show why she should've been awarded tenure, but that's where she and Mercer part ways. She relies on the past, but Mercer looked to the future when it denied tenure. With an unwavering belief that it treated her unfairly only because she's a woman, she sued.

Now, to sort of prime you for what's to come: "Tenure is based on merit" at Mercer.[1] Per its faculty handbook, merit, for tenured appointments,

is determined in the aggregate with emphasis on the following criteria:

a. Quality of ***teaching*** and attention given to students as individuals.
b. Breadth, depth, and variety of education and experience.
c. Professional achievement and ***scholarship***.
d. Responsible participation in group deliberative processes.
e. Professional responsibility and ***service*** to the school and community.[2]

***Teaching. Scholarship. Service.***[3] Those are three words you'll see mentioned ad nauseam throughout this opinion, but it was "service" and a lack of "[r]esponsible participation in group deliberative processes" that led to this professor's unsuccessful efforts for tenure. As you'll soon see, she received mostly positive feedback when it came to teaching students and excellent evaluations concerning her service both within

---

[1] [Doc. 56-8, p. 36].

[2] [*Id.* (emphasis added)].

[3] "The tenure review process tended to emphasize three criteria: intellectual contributions, quality of teaching, and service." [Doc. 41-4, Gilbert Aff., ¶ 8].

and outside the business school.[4] So, what happened? Why the tenure denial?

## FACTUAL BACKGROUND

After receiving her undergraduate degree from Florida State University, national tennis champion Ania Rynarzewska continued to pack degrees and certificates into her educational quiver.[5] Still donning garnet and gold, she first earned her master's degree and then set her sights on a Ph.D. in mass communication.[6] While taking courses for her master's program, one of her professors, Dr. Steven McClung, left Florida State to teach at Mercer University.[7] She clearly made a positive and lasting impression on Dr. McClung as the two occasionally kept in touch.[8] Familiar with not only her drive, but her capabilities, Dr. McClung, who was then the associate dean of the business school on the Macon campus,[9] recruited his former student to apply for an open teaching position.[10]

As the new 2013-2014 academic year approached, Mercer hired Dr. Rynarzewska

---

[4] *See, e.g.,* [Doc. 14-9, p. 5].

[5] [Doc. 37-4, Rynarzewska Depo., pp. 23:13—24:1; 24:8–12; 24:21–23].

[6] [*Id.* at pp. 23:18—24:1].

[7] [*Id.* at pp. 28:19—29:19].

[8] [*Id.* at pp. 29:13–23; 30:10–14].

[9] Mercer University's business school has two campuses: one located in Macon, Georgia (its main campus), and the other located in Atlanta, Georgia. [Doc. 35-13, Underwood Depo., p. 26:21–24].

[10] [Doc. 14-6, p. 14]; [Doc. 37-4, Rynarzewska Depo., pp. 28:19–24; 30:1–3; 30:20—31:1; 31:25—32:2].

as a Visiting Professor of Sports Business on June 17, 2013, under a nine-month contract for a non-tenure track appointment.[11] According to Dr. Rynarzewska, though, she understood that Mercer planned to hire her for "the only position that was open and the only position [she] applied for"—a tenure-track position in the "high 90s" salary range—instead of one for a visiting professor at $70,000.[12] Nevertheless, at some point during Dr. Rynarzewska's first year of teaching, Dr. Susan Gilbert, who served as the business school's dean from April 2013 to May 2019, approached human resources with the possibility of simply converting Dr. Rynarzewska's employment into one where she could one day seek tenure.[13] That's exactly what happened.[14] Confirmed by an appointment letter from Dean Gilbert for the 2014-2015 academic year, Mercer offered Dr. Rynarzewska another nine-month contract.[15] This time, though, it was for a tenure-track position of Assistant Professor of Sports Business, and she managed to negotiate a salary in the high $80,000 range.[16]

As a newly minted associate professor for the 2014-2015 academic year, Dean

---

[11] [Doc. 14-6, p. 14]; [Doc. 37-4, Rynarzewska Depo., pp. 30:23—31:1].

[12] [Doc. 37-4, Rynarzewska Depo., pp. 32:9–10; 33:19–24; 34:16–17]; [Doc. 41-3, Rynarzewska Aff., ¶¶ 27, 54].

[13] [Doc. 14-6, p. 13]; [Doc. 37-4, Rynarzewska Depo., pp. 39:21—40:1; 40:7–11]; [Doc. 41-4, Gilbert Aff., ¶ 4].

[14] [Doc. 37-4, Rynarzewska Depo., p. 40:12–13].

[15] [Doc. 14-6, p. 13].

[16] [*Id.*]; [Doc. 37-4, Rynarzewska Depo., pp. 40:14–16; 45:14—46:1]; [Doc. 41-3, Rynarzewska Aff., ¶ 54].

Gilbert informed Dr. Rynarzewska that she'd be teaching five courses, with 65% of her duties geared towards teaching, 15% towards service activities, and 20% for research.[17] The next couple of years passed unassumingly, and while it's not uncommon for duty percentages to slightly fluctuate from year to year, Dr. Rynarzewska secured renewed employment contracts from 2015-2017.[18]

"The *University Faculty Handbook* describes the organizational structure and governance" of Mercer and "sets forth the major policies and procedures affecting faculty members."[19] "Though tenure may be granted at any time by the university president, usually it is conferred only after completion of a probationary period."[20] "Fitness for tenure is determined through a review process involving faculty colleagues, department chairpersons, faculty personnel committees, and academic officers who consider evidence of the candidate's contribution to the educational program, scholarship, and potential for continued contribution" to Mercer.[21]

A letter[22] dated April 4, 2017, addressed to Dr. Rynarzewska from Dean Gilbert

---

[17] [Doc. 14-6, p. 13].

[18] [Doc. 14-6, pp. 7–11]; [Doc. 35-6, Petherbridge Decl., ¶ 19].

[19] [Doc. 14-7, p. 2].

[20] [*Id.* at p. 37].

[21] [*Id.*].

[22] [Doc. 14-6, p. 6].

states:

> Section 2.04.2.5 of the *University Faculty Handbook* provides as follows:
>
>> "Review and notification for tenure occurs during the sixth year of full-time faculty appointment [at Mercer] and may not be deferred beyond that year. . . . Tenure becomes effective at the beginning of the seventh contract year."
>
> You initially joined the faculty in the Eugene W. Stetson School of Business and Economics as an [a]ssistant [p]rofessor in July [20]14. The initial appointment letter identifies Fall 2020 as the year of tenure evaluation. Based upon the faculty handbook the evaluation year should have been Fall 2019. A one-year extension was granted to you in May 2016.[23] Thus, should you remain employed with Mercer University you will be eligible to apply for tenure during the Fall . . . 2020. Tenure, if awarded, will become effective at the beginning of the 2021-[20]22 academic year.
>
> Please acknowledge your receipt and acceptance of the foregoing terms and conditions by signing the enclosed copy of this letter in the space indicated below and returning the signed copy to me.

Dr. Rynarzewska "accepted and agreed to" those terms on April 21, 2017, and she received renewed contracts for the 2017-2018 and 2018-2019 academic years.[24] During the 2018-2019 academic year (on November 27, 2018, to be precise), Dr. Rynarzewska underwent her mid-tenure review.[25]

In a memo from the P&T Committee (or as it's formally called, the Promotion &

---

[23] When Dr. Rynarzewska applied for tenure, she had "been in a tenure-track position for seven years, having taken one year as a 'stop clock' due to" the birth of her twins in early 2016. [Doc. 41-3, Rynarzewska Aff., ¶¶ 44, 56].

[24] [Doc. 14-6, pp. 4–6].

[25] [*Id.* at pp. 4–5]; [Doc. 14-11, p. 3].

Tenure Committee), Dr. Rynarzewska received a favorable—not perfect, but certainly

positive—review. While the P&T Committee conveyed to Dean Gilbert that it

considered Dr. Rynarzewska to be a "net asset" to the business school: a "source of

great energy," well-liked by her students, and a "productive researcher,"[26] it gave

something more akin to room-for-improvement reviews with regard to her service

contributions to the business school or to Mercer as a whole.[27] At one point in its memo,

the P&T Committee praised Dr. Rynarzewska for her "many contributions to the

school," commenting that "by large measure" she has "exceeded expectations" when it

came to service.[28] Then, in the same memo, the P&T Committee also characterized Dr.

Rynarzewska's service to the profession and professional development as only

"adequate."[29] The P&T Committee noted that even though Dr. Rynarzewska made

"meaningful contributions on committees and always answer[ed] the call when her

service [was] needed," she should begin to make regular contributions to professional

organizations beyond offering presentations at conferences."[30] While "exceeds

expectations" and "adequate" don't necessarily seem to gee and haw, it's clear that the

---

[26] [Doc. 41-3, Rynarzewska Aff., ¶ 22 (discussing the importance Dean Gilbert placed on undergraduate research)].

[27] [Doc. 14-11, pp. 4–5].

[28] [*Id.* at p. 4].

[29] [*Id.* at p. 5].

[30] [*Id.* at pp. 4–5].

P&T Committee just took an opportunity to address an area of improvement, and that's never a bad thing. All in all, though, regardless of its views on Dr. Rynarzewska's service, the P&T Committee "believe[d]" that she was "on track for a positive recommendation for tenure."[31] As the 2018-2019 academic year came and went, you can probably guess what came next: another nine-month contract.

On May 10, 2019, Mercer offered Dr. Rynarzewska a nine-month contract for the 2019-2020 academic year—an academic year that would be unlike anything Mercer, its faculty, its staff, or its students had ever experienced.[32] The Court, of course, isn't referring to the fact that Dean Gilbert retired in May 2019 or that her retirement brought new changes in the business school's faculty leadership.[33] Instead, it's referring to the COVID-19 pandemic that began to affect Georgia in March 2020.[34] COVID-19 certainly plays into Dr. Rynarzewska's claims against Mercer, but for now, let's just focus on the changes within the business school's leadership.

Beginning in the 2019-2020 academic year, Dean Gilbert retired, and Mercer's provost, Dr. Scott Davis (who sadly passed away during the pendency of this litigation), appointed a new dean: Dr. Julie Petherbridge—who, prior to this appointment, served

---

[31] [*Id.* at p. 6].

[32] [Doc. 14-6, p. 3].

[33] [Doc. 37-2, ¶ 9]; [Doc. 41-4, Gilbert Aff., ¶¶ 3–4].

[34] [Doc. 41, pp. 2–3].

as the associate dean on the business school's Atlanta campus from 2017-2019.[35] When Dean Petherbridge took over as interim dean for the business school in July 2019, Dr. McClung was still the associate dean of the business school on the Macon campus, but he left Mercer mid-school year.[36] This led Dean Petherbridge to appoint Dr. Tammy Crutchfield as the associate dean of the business school for the Macon campus starting in January 2020.[37] Not only were Dr. Rynarzewska, Dean Petherbridge, and Associate Dean Crutchfield colleagues, but Dr. Rynarzewska considered these two women as friends[38] and wanted nothing but success for her friends in their new leadership roles.

About two months later, Georgia and the rest of the country really began to feel the impacts of COVID-19, and "[n]obody" at Mercer "had dealt with [something like COVID-19] before."[39] Faced with and sympathetic to "students pleading with [him] to let them finish their [year-long] research programs," Mercer's president, Bill Underwood, decided to keep the university open.[40] However, his attempt to do so was met with criticism from not only Dr. Rynarzewska—from a public-opinion perspective

---

[35] [Doc. 35-6, Petherbridge Decl., ¶ 3]; [Doc. 41, p. 2 (citing [Doc. 37-2, ¶ 9])]; [Doc. 41-3, Rynarzewska Aff., ¶ 3].

[36] [Doc. 36-6, Crutchfield Depo., p. 15:4–6]; [Doc. 41, p. 2 (citing [Doc. 37-2, ¶ 10])].

[37] [Doc. 35-6, Petherbridge Decl., ¶ 3]; [Doc. 36-6, Crutchfield Depo., p. 15:4–6].

[38] [Doc. 41-3, Rynarzewska Aff., ¶¶ 4, 6].

[39] [Doc. 35-13, Underwood Depo., p. 54:10].

[40] [*Id.* at p. 54:10–13].

about how the university's efforts to remain open was about money and "out of greed"—but from other faculty members across the university's school and colleges as well.[41] With his initial effort to keep the university open not well-received, President Underwood "back[ed] off of it" and worked to find ways to accommodate those that wanted to remain on its campuses and those that wanted to leave.[42]

Now, how does COVID-19 play into Dr. Rynarzewska's lawsuit against Mercer? Well, for starters, the pandemic brought "a great deal of additional work" for everyone.[43] Aimed towards helping Dean Petherbridge and Associate Dean Crutchfield succeed in their new roles, Dr. Rynarzewska says she "filled gaps in course coverage," attended faculty events outside of business hours, and "even created a brand-new course with almost no time to prepare because Dean Petherbridge wanted to generate more revenue for the [u]niversity."[44] More than once, Dr. Rynarzewska says that Dean Petherbridge and Associate Dean Crutchfield asked her for ideas and for her advice on how to deal with the effects of COVID-19 "because of [her] training and experience in crisis management."[45] In what she characterizes as "help" to her friends—letting them

---

[41] [*Id*. at pp. 53:23—54:6]; [Doc. 41-3, Rynarzewska Aff., ¶ 49].

[42] [Doc. 35-13, Underwood Depo., pp. 54:14–17; 74:17–25].

[43] [Doc. 41-3, Rynarzewska Aff., ¶ 6].

[44] [*Id*. at ¶ 7].

[45] [*Id*. at ¶¶ 9, 16, 47–49].

"know of issues and concerns" about COVID-19—Dr. Rynarzewska says that Dean Petherbridge and Associate Dean Crutchfield began to mischaracterize things said on phone calls and in-person interactions.[46] Why? According to Dr. Rynarzewska, their change in behavior towards her not only coincides with the onslaught of COVID-19, "around February and early March 2020," but more particularly with when she "raised concerns about unequal treatment and pay compared to" that of some of her male co-workers.[47] So, just to be safe, Dr. Rynarzewska started emailing "recap[s]" of their conversations.[48] According to her, though, many of the emails she sent with the intention of being helpful were later used against her when it came to her tenure application.[49]

On March 13, 2020, Dr. Rynarzewska responded to an email sent from a business-school colleague to her and Dean Petherbridge.[50] There, Dr. Rynarzewska, having noted that another university—Berry College—chose to close for a week and then transition into online instruction, responded:

> Interesting how every school seems to care about students AND faculty. We choose to overload faculty with double work for every class. So[,] basically I now teach [six] classes. [Two] face[-]to[-]face analytics,

---

[46] [*Id.* at ¶ 11].

[47] [*Id.* at ¶ 5].

[48] [*Id.* at ¶¶ 11, 47].

[49] [*Id.* at ¶ 9].

[50] [Doc. 56-4, p. 10].

[two] online classes, [one] online social media[,] and [one] face[-]to[-]face social media.
Our students just got back from spring break.
Incubation time is [two] weeks. In two weeks, it will be interesting all around.
So[,] my students are anxious about exposure but also anxious about leaving campus because face[-]to[-]face [classes] will still be on[.]
So[,] they will stay while remaining extremely anxious about the disease. This is not healthy for anyone.[51]

On March 15, 2020, Dr. Rynarzewska responded to another email.[52] This one, sent by a different business-school colleague who had just attended a meeting with President Underwood and other university leadership, detailed how Mercer planned to educate its students in the face of COVID-19.[53] Dr. Rynarzewska wrote:

> Thank you. You heard my concerns in a [Z]oom[,] so I will not repeat them. I want to draw attention to something different:
> In case you are not aware[,] there are petitions and open calls all over social media and the internet from students. Students know it's about money[,] and it doesn't improve their "experience[.]" This really looks bad from [a] [public relations] perspective, our perspective and student perspective. I will gladly provide you with links if you wish.
> I did a survey of my students and [the] overwhelming majority prefer online. Those who will do face[-]to[-]face are those students who are athletes thus forced to be here for ATHLETICS! I was an athlete. I know the force behind it. Even if they get to "volunteer" practice, they were more "voluntold."
> In summary, [the] overwhelming majority "would feel safer at home, avoiding public areas, or exposing themselves to [the] virus and touching those nasty keyboards[.]" These, of course, are their words.
> Just a perspective on those priorities listed in the original [House of

---

[51] [*Id.*].

[52] [*Id.* at pp. 11–13].

[53] [*Id.*].

Delegates] email because we are secondary as noted.

Finally, many other schools are in our shoes. I received copies of emails from deans to their faculty. They have labs and seniors and experiential learning just like us, their states have fewer confirmed cases[,] but they prioritize health and mental wellbeing of their students, faculty[,] and community at large.

I, once again, ask what are we doing? Students do not want this "privilege" of choice. They feel at risk and forced to stay.

We, [*sic*] were never asked, but again, we are not a priority here[,] and it's clear. This goes against everything we teach in classes.[54]

In what you'll soon see as a campaign of sorts to explain away what could be perceived as a certain tone throughout her emails, Dr. Rynarzewska—with respect to her response emailed on March 15, 2020—says it appeared, to her, that President Underwood was not "aware of the sentiment on the ground, so [she] provided it."[55]

Then, skipping ahead to the start of the 2020-2021 academic year, Dr. Rynarzewska asked Dean Petherbridge and Associate Dean Crutchfield: "Can we PLEASE find out the current number of positive cases and out of how many tests?! Please do not reply with 'no comment.'"[56] Dean Petherbridge replied, "We do not have that information. If we did, I would share it. I do have a dean[s'] meeting tomorrow[,] and I'll let you know if I find out anything. Why does it matter at this point[?] That is the purpose of testing as the students move in."[57] In an effort to walk back what might

---

[54] [Doc. 35-13, Underwood Depo., pp. 54:10—55:1]; [Doc. 41-3, Rynarzewska Aff., ¶ 49]; [Doc. 56-4, p. 11].

[55] [Doc. 41-3, Rynarzewska Aff., ¶ 49].

[56] [Doc. 56-4, p. 21].

[57] [*Id*.].

come off as an abrasive email, Dr. Rynarzewska mentions that she had "just taught a crisis management course where the phrase 'no comment' was discussed extensively" and that her use of the phrase "was intended to be a joke between friends."[58] Joking or not, Dr. Rynarzewska says that the number of positive COVID-19 cases was "long-promised information," and when that number wasn't given, frustrations were expressed.[59]

Dr. Rynarzewska also commented about how Dean Petherbridge and Associate Dean Crutchfield didn't follow masking and social-distancing protocols set by the university.[60] "On more than one occasion," according to Dr. Rynarzewska, "they became frustrated when anyone, student or faculty, pointed out [that] they [were] not following the requirements set by President Underwood and the university."[61] "In fact," Dr. Rynarzewska says she "received a number of complaints from students who were uncomfortable in Associate Dean Crutchfield's classes because she did not wear a mask but a plastic shield instead."[62] Dr. Rynarzewska says she "opted to follow [university-wide] efforts" with respect to masking protocols "even if it meant occasionally

---

[58] [Doc. 41-3, Rynarzewska Aff., ¶¶ 13, 50].

[59] [*Id.*].

[60] [*Id.* at ¶ 20].

[61] [*Id.*].

[62] [*Id.*].

disagreeing with the deans of [the business school]."[63]

There's so much to be said when it comes to the back-and-forth regarding COVID-19, but what the Court has laid out is more than enough. All you really need to know and understand is that President Underwood wasn't copied on Dr. Rynarzewska's emails about COVID-19, but he was later made aware of them when she sought tenure. Once he reviewed what all she had to say about his efforts to keep the university open, President Underwood interpreted her thoughts as critical, but that was "okay with [him]" because in time, he "moved on from" those efforts.[64] Then, when it comes to the emails exchanged between her colleague and friend, Dr. Rynarzewska says she often expressed her sympathy with the "tough spot" Dean Petherbridge found herself as a result of the pandemic.[65] That sympathy, however, may not have been received as such by Dean Petherbridge because she went so far as to say that the tone of Dr. Rynarzewska's "emails to [her], as a whole, was more disrespectful and unprofessional than that of other emails [she had] received from another other faculty or staff at Mercer."[66]

---

[63] [*Id.*].

[64] [Doc. 35-13, Underwood Depo., pp. 53:23–25; 54:1–3; 54:14–17].

[65] [Doc. 41-3, Rynarzewska Aff., ¶ 13]; *see also* [Doc. 59-23, p. 1 (Dr. Rynarzewska's email sent to Dean Petherbridge on August 10, 2020, stating: "Thank you. Hang in there. I KNOW your job sucks right now[.]")].

[66] [Doc. 35-6, Petherbridge Decl., ¶ 8].

In the peak of new campus-wide adaptations because of the pandemic, Dr. Rynarzewska prepared to apply for tenure as she approached her seventh year of tenure-track employment.[67] In her appointment letter for the 2020-2021 academic year, Dean Petherbridge "reduced [Dr. Rynarzewska's] percentage for research and increased [her] percentage for service because" of concerns that Dr. Rynarzewska wasn't meeting the requirements for service.[68] "The change in expected percentages of duties was intended to communicate to [Dr. Rynarzewska] that she needed to devote more time to service."[69]

Just like every year since starting to teach at Mercer, Dr. Rynarzewska received an annual evaluation.[70] On July 1, 2020—for her performance review covering the 2019 calendar year—Dr. Rynarzewska received "[m]eets expectations" for teaching, "[e]xceeds expectations" for scholarship, and "[e]xceeds expectations" for service.[71] Specifically, Associate Dean Crutchfield said, "Ania[,] I know you pour yourself into your teaching," but she also noted that Dr. Rynarzewska needed "[m]ore hands-on

---

[67] [Doc. 41-3, Rynarzewska Aff., ¶ 56].

[68] [Doc. 35-6, Petherbridge Decl., ¶ 19]; *see* n.99, *infra*.

[69] [Doc. 35-6, Petherbridge Decl., ¶ 19].

[70] *See generally* [Doc. 14-9].

[71] [*Id.* at p. 4].

[project-based] work in class and less lecture."[72] Generally speaking, with respect to Dr. Rynarzewska's teaching performance, Associate Dean Crutchfield commented, "This eval[uation] is actually between meets and exceeds expectations."[73] Then, as to service, Associate Dean Crutchfield commended Dr. Rynarzewska for her willingness to "jump in and help," but urged her "to lead a committee or student org[anization]" as she began to "transition into senior faculty."[74] In response to these comments, Dr. Rynarzewska said, "Thank you for the positive feedback. [I] will definitely take it into account. P.S. I see that I forgot [to mention] some elements of my service[,] but given the positive nature of this review, I will just add them to my tenure package."[75]

Early in the Fall 2020 semester, Dr. Rynarzewska submitted her tenure package for review by a P&T Committee made up of five tenured business-school faculty—three from the Macon campus and two from Atlanta—whose recommendation would eventually reach President Underwood.[76] In his time at Mercer, President Underwood has "reviewed maybe 250 or 300" applications for promotion and tenure.[77] Typically,

---

[72] [*Id.*].

[73] [*Id.*].

[74] [*Id.*].

[75] [*Id.*].

[76] [Doc. 35-13, Underwood Depo., pp. 14:11—15:18]; [Doc. 36-3, Crutchfield Depo., p. 64:5–19]; [Doc. 41-1, ¶ 24]; [Doc. 41-3, Rynarzewska Aff., ¶ 56].

[77] [Doc. 35-13, Underwood Depo., p. 15:10–12].

the process starts with "the application submitted by the candidate," followed by "the recommendation from the school or college's [P&T] [C]ommittee" and a recommendation from the dean that is addressed to the provost for President Underwood's review.[78] Put simply, it starts with a tenure application, then the school or college's P&T Committee gives its recommendation to its dean, and that dean gives a recommendation that is eventually reviewed by the university president.

After Dr. Rynarzewska submitted her application for promotion and tenure in Fall 2020, her P&T Committee "evaluated [her] portfolio," and on December 18, 2020, it "unanimously recommend[ed]" tenure.[79] In its recommendation to Dean Petherbridge, the P&T Committee touched upon Dr. Rynarzewska's teaching approach, noting that it was "between satisfactory and excellent, with an average teaching evaluation score of 4.17 out of 5.0 across all her classes."[80] "While the overall evaluation of teaching is skewed towards excellent," the P&T Committee noted "a minor concern" regarding some low student evaluations "with infrequent scores between 3.0/5 and 3.9/5 in new courses she taught or in courses she was abruptly called upon to teach or step in."[81] As for service, her service to students was "outstanding," with 800 documented hours of

---

[78] [*Id.* at p. 15:12–18].

[79] [Doc. 41-3, Rynarzewska Aff., ¶ 56]; [Doc. 56-2, pp. 1, 3].

[80] [Doc. 56-2, p. 1].

[81] [*Id.*].

internships between 2019 and 2020 offered through her business.[82] Then, when it comes to service to the business school, the university, and the community, the P&T Committee said that she "goes beyond what is requested" by the business school's leadership.[83] From 2015 to 2017, as a newly minted assistant professor, Dr. Rynarzewska jumped on the challenging opportunity to serve as the director for the Master of Science in Business Analytics program, and while at Mercer, she created 12 new courses.[84] However, just like Associate Dean Crutchfield urged her to do in her July 1, 2020 performance review, the P&T Committee still saw the need to "encourage[] [Dr. Rynarzewska] to continue to explore leadership opportunities in [the business school] and the university, such as chairing committees, *directing* clubs[] or degree programs . . . and/or serving on [u]niversity-level committees to build her portfolio for her future application for promotion to full professor" in its recommendation some five months later.[85] The important or key takeaway for Dr. Rynarzewska's claims against Mercer, though, is that the P&T Committee saw her as someone who "exhibit[ed] collegial values within [the business school]" and was "an active and enthusiastic participant" at

---

[82] [*Id.* at p. 2].

[83] [*Id.*].

[84] [*Id.*].

[85] [Doc. 14-9, p. 4]; [Doc. 56-2, p. 2 (emphasis added)]; *see also* [Doc. 59-27, p. 2 ("The [P&T] Committee commends [Dr. Rynarzewska] on her excellent work; but cautions her to avoid spreading herself too thin or overcommitting as she continues to expand her portfolio to full professor.")].

business school and university functions.[86] From its perspective, the P&T Committee clearly believed that Dr. Rynarzewska "ha[d] met the criteria for tenure via her teaching, service, and scholarship."[87]

Notwithstanding what was pretty much a glowing recommendation for tenure from the P&T Committee, Dean Petherbridge's recommendation—which would eventually be received and reviewed by President Underwood—veered in a different direction.[88] On January 31, 2021,[89] typical to the tenure process, Dean Petherbridge gave her recommendation stating: "While the P&T Committee recommends tenure, I do not recommend Dr. Rynarzewska for tenure and promotion to [a]ssociate [p]rofessor."[90] Then, expounding on what the P&T Committee wrote to her, Dean Petherbridge attached a slew of emails to her recommendation to back up her thoughts on Dr. Rynarzewska's efforts to obtain tenure.[91]

First, contrary to what the P&T Committee had to say about Dr. Rynarzewska's teaching approach, Dean Petherbridge cautioned that Dr. Rynarzewska's teaching

---

[86] [Doc. 56-2, p. 3].

[87] [*Id.*].

[88] [Doc. 35-13, Underwood Depo., p. 15:12–18]; [Doc. 56-4, pp. 1–3].

[89] *See* n.273, *infra.*

[90] [Doc. 35-13, Underwood Depo., p. 15:12–18]; [Doc. 56-4, p. 1].

[91] *See, e.g.,* [Doc. 56-4, pp. 4–24].

evaluations were "not consistent"—with "clarity of the work [assignments] and

disorganization" as her most common issues.[92] To support her concerns about Dr.

Rynarzewska's teaching abilities, Dean Petherbridge attached an email from January 28,

2020, sent by an associate dean regarding Dr. Rynarzewska's Marketing Analytics class:

> Hi Ania,
>
> We have received some complaints about this class and clarity of material posted, clarity in assignments as well as assistance with working with [statistical] software (as students do not have any prior knowledge of this software) and limited time on virtual office hours. [Dean Petherbridge] is in Macon [tomorrow] and has requested that we do a [Z]oom session at 4[:00] [P.M.] [tomorrow] evening to see how we can help you resolve some of these issues. Please let us know if that will work for you.[93]

Dr. Rynarzewska replied:

> Sure. This class is a little frustrating. My requests to "contact me, ask me questions[,] let me know what you need please, reach out to let me know in terms of needs and how I can better serve you" repeated in every assignment, every [Z]oom, every additional video I make for them seem to hit a wall, yet…oh so eager to contact you. Yes, there is frustration in this post but why is nobody reaching out to me but are so easy to complain to you?
> To give you an idea: I do have a [Z]oom meeting with one student at 10[:00] and emailed with another one but other than this[,] ZERO. Normally, I have a [Z]oom class today at 12[:00] as always. I make [Z]oom videos live, then review videos that I post for them on [YouTube] that are short (they seem to be able to best view them this way[)], post chronology of materials to read, tutorials step by step with screenshots. I really would like to know what else can be done beyond this.
> So[,] I cover material and keep asking the same questions to please contact me for help…and nobody apart of two contact me.

---

[92] [Doc. 56-4, p. 1].

[93] [Doc. 41-26, p. 2]; *see also* [Doc. 56-4, p. 4].

> Yes, [I]'d love to meet at 4[:00] to help them out and help me out to serve
> them better but some responsibility to ask questions need[s] to be placed on
> these graduate students as well. I am also happy to send you all materials
> and all my requests to contact me I keep posting.[94]

Then, in a follow-up email, Dr. Rynarzewska wrote:

> P.S. I also have a "student help discussion board[.]" Students get extra
> credit for posting questions and helping each other (I do monitor that for
> mis information [*sic*]) but nobody posted either.
> Between this and [my] previous email, you know everything I do. The book
> the[y] have [on the statistical software] also has explanations with
> screenshots for every analysis I use.
> If you have any ideas [about] what else I can do, I will appreciate [them]
> because I am out of ideas. I used all my tools.
> Thank you for your help and [talk to you] at 4[:00].[95]

Second, when it came to her view of Dr. Rynarzewska's service to students, Dean

Petherbridge's opinion drastically differed from that of the P&T Committee's.

According to Dean Petherbridge, there were "concerns that students [were] being

exploited towards a [for-profit] business[96] for a faculty member" and that, although Dr.

---

[94] [Doc. 41-26, p. 2]; *see also* [Doc. 56-4, p. 4].

[95]  [Doc. 41-26, p. 3].

[96] If you're wondering what this for-profit business is, it's Lux Leonis—a skincare, haircare, and candle-
and soap-making business that Dr. Rynarzewska ran out of her home until she received approval to
conduct the business from the Mercer Innovation Center. [Doc. 37-4, Rynarzewska Depo., pp. 55:3—56:12;
152:22—153:19]; [Doc. 41-3, Rynarzewska Aff., ¶ 31]. According to Dr. Rynarzewska, Stephanie Howard,
the Mercer Innovation Center's director, wanted Lux Leonis to run its operations directly from the center
because it was a business "with physical product" that people would see when they visited. [Doc. 37-4,
Rynarzewska Depo., pp. 154:21—155:4]. Not that it's at all material to Dr. Rynarzewska's underlying
claims against Mercer, but there seems to be some disconnect about whether the Lux Leonis interns were
paid. *Compare* [*id.* at pp. 155:19—156:18 ("Nobody paid them.")], *with* [Doc. 56-4, p. 2 ("Student[] [interns]
were paid through a grant of the Mercer Innovation Center[,] and Dr. Rynarzewska did not use any
personal resources for this.")].

Rynarzewska had "a number of interns," "[m]ost of the[ir] work" consisted of "menial tasks and not that of a quality business internship."[97] True, some of Dean Petherbridge's concerns were intern related, but what stood out the most to her stemmed from Dr. Rynarzewska's involvement with one of the business school's student clubs, the American Marketing Association—often shorted to "AMA."[98] On April 17, 2020, Dr. Rynarzewska emailed Dean Petherbridge and Associate Dean Crutchfield:

> Hi!
> Base [*sic*] on my faculty eval[uation]s, I think I need some clarification because I am hearing conflicting things since my arrival.
> If my teaching for internship and taking on every student that needs internship does not hold any service value, I will no longer do it. I do not get return on my time investment.
>
> If I am forced to to do [*sic*] an AMA [*sic*] because doing so much research with students and internships AND serving on dissertation committees does not sufficiently count as service then I need to know exactly what my duties are. WHat [*sic*] activities need to be held, etc. I never did a club nor was [I] EVER part of a club. I cannot do nights and afternoon or weekend trips[,] though. There need to be some guidelines.[99]
>
> As a side note, I just do not know how this is ok[ay] that some people only show up on class days and just be mostly unavailable to students and service duties (such as recruiting) and they do not get twisted into doing more. My plate has been overflowing since I arrived at Mercer. I have always been happy to take one for the team[,] but there are too many "one for the team" on my plate while others just sit back and do nothing.

---

[97] [Doc. 37-4, Rynarzewska Depo., p. 155:19–21]; [Doc. 56-4, p. 2].

[98] [Doc. 41-3, Rynarzewska Aff., ¶ 25].

[99] Apparently, in late Spring 2020, "mere months before [Dr. Rynarzewska] was to submit [her] tenure application, Dean Petherbridge and Associate Dean Crutchfield began telling [her] that they did not believe anything that was accompanied by payment, no matter how small, would count as service in [her] tenure review." [*Id.* at ¶ 23].

If I have to name them I will[,] but I think we all know who they are (and they are paid more). I WILL SUPPORT THE SCHOOL THE BEST I CAN DURING THIS DIFFICULT TIME[,] but if all [I] do holds no value because I do not do [a] club then I simply do too much. This year has just revealed to me a lot[,] and it is getting really hard to keep "taking one for the team[.]" Again, please confirm that internships, attending all recruiting, serving on dissertation committees, and doing a lot of research with students hold no or minimal service value because that would really help to know what counts and what does not. I just may be spreading myself too thin which is where the frustration comes from.

Thanks,[100]

Then, late that night, Dr. Rynarzewska continued to vent her frustrations and

sent another service-related email to Dean Petherbridge and Associate Dean

Crutchfield:

I am going to speak with my mentor from [the] U[niversity] of Michigan about this, so he can help me. We know that my Mercer [m]entor did me wrong[,] so the Michigan guy took me under his wing. If I have to do clubs, it has to be AMA[,] but I will need guidelines. I cannot do [Sports Marketing and Analytics Club], I am not even familiar with [the] teams[,] and it would be an embarrassment to the school. [M]y social anxiety will have to somehow survive.

I also cannot travel or do late afternoons. These are my simple life limitations because of children and no village to support me. My husband doesn't get home [until] 9[:00] [or] 10[:00] [P.M.] [from work].

I am ditching the internship program. It offers zero benefit to my business, I have spent countless hours teaching people branding, how to build [E]xcel databases, calculate costs, build and manage websites, [and] run ads [and search engine optimizations.] But I can do it more efficiently on my own if that's not considered "service" to students.

I am also ditching "off record" research and will only take on students who

---

[100] [Doc. 56-4, p. 18]; *see also* [Doc. 41-3, Rynarzewska Aff., ¶¶ 22–24].

do it for credit. Unfortunately[,] I am spreading myself too thin so if something needs to be added, something else must come off. I am already on campus daily. Burn out is a real thing so I need to avoid it at all cost [*sic*]. We all know that my work output is above average.

Nonetheless, if this is how I need to support school through this time, so be it. I hope it helps[,] and I hope I can get good at it.[101]

Early the next morning, Dean Petherbridge responded: "Hi Ania, I have read your emails, but I do believe that you should talk more with Tammy on this. Next week, I will be working with the executive committee for the school and putting together a slate for committee assignments for next year."[102] And then, Dr. Rynarzewska replied: "I will [talk with Tammy][,] but I wanted it in writing especially since you told me I cannot be forced to do [AMA] if research is my strength."[103] Next, Dean Petherbridge sent two back-to-back emails because the first one—sent from her iPhone—accidently "sent" instead of going into her drafts folder:[104]

First, we are planning next year. We still do not know if we will be hiring the sports marketing position. We won't know for a while. Everyone is going to have to be open if we do not hire.

Second, no one is forced to do anything. Most emails I am receiving during this unprecedented time

Sent from my iPhone

Sorry, I was using my phone[,] and it sent instead of going to drafts.

---

[101] [Doc. 56-4, pp. 17–18].

[102] [*Id.* at p. 17].

[103] [*Id.* at p. 16].

[104] [*Id.* at pp. 15–16].

Right now, I am working on furlough and layoffs of staff which is the last thing I want to be doing. We are going to be short[,] and everyone has to be flexible. Nothing is set right now[,] and we will be working on it.

Thank you for your emails. Our first priority is our students and how best to provide the best educational experience. We may need to think outside the box for next year and do things a little different. Give us time, but also be open minded and provide us some alternatives. I believe that would be helpful while we try to navigate this unprecedented situation.

Thank you,

Julie[105]

And lastly, with respect to this chain of emails regarding service, Dr.

Rynarzewska wrote:

First of all[,] I have always been flexible[,] I hope you know that. The reason I have been so frustrated [is] because of everything that hit the fan.
I am open to overloads and thinking outside the box[,] but I have been hearing "you will have to do this" with regards to [c]lubs since we have been hiring the marketing position even long before [COVID-19].

Second, I have always been opened [*sic*] to help which is why I did internships and million [*sic*] research projects a year[,] but if it [*sic*] not viewed as a benefit to students (internship)[,] then I frankly am wasting time. I never said no to anything thrown at me[,] but in face (before [COVID-19]) of major inequalities you have to see how it feels to be constantly told to do more when others barely show up to work[.]

Tammy told me she will fill me in on [AMA].

I have never NOT been a team player.

Finally, [m]y heart does break for furloughs and layoffs. I wish I could help[,] but I don't know how because my own account is dead empty. In

---

[105] [*Id.*].

fact, my credit cards are also maxed out which is why I have been complaining about pay inequalities before [COVID-19].

[(Because] I am a team player, I am agreeing to AMA but it has to be managable [*sic*] with my life (no late afternoon)[,] but I also ask that you guys see how I have been done wrong over all these years and now I find out that my service is not "service enough[.]")

I don't know what other alternatives I can offer besides things I have been doing[:]

*Research
*[I]nternships (which I want to take off the table)
*[O]verloads
*Mentorship

[B]ut I am willing to hear the options, of course.
Let me know if there is any other way I can help. I just don't know[.][106]

Then, as for service to the business school, the university, and the community, Dean Petherbridge says that Dr. Rynarzewska "was paid a stipend" as the director for the Master of Science in Business Analytics program.[107] So, what she's saying is that because Dr. Rynarzewska was paid to serve as the director of that program—that wasn't really "service" at all. What's more, according to Dean Petherbridge, Dr. Rynarzewska "was always seeking" additional classes to teach—"overloads" as they

---

[106] [*Id*. at p. 15].

[107] [*Id*. at p. 2].

call them—"[b]ecause of her need"[108] for "extra compensation."[109] In response to the

P&T Committee's opinion of Dr. Rynarzewska's teaching approach, one that sort of

meshes teaching with service, Dean Petherbridge pointed out that "it was advised to

[Dr. Rynarzewska] to not continue to seek [overloads][110] and focus on the quality of the

courses she was teaching. She chose not to follow this advice which may have

contributed to her poorer quality of teaching."[111] But how does that commentary mesh

teaching and service together? Well, as Dean Petherbridge puts it—when "we're

looking at service to the university[,] [s]ervice . . . is not creating classes that you were

compensated for."[112]

Finally, "[a]s interim dean," Dean Petherbridge wrote: "I must not agree with"

the P&T Committee's opinion that Dr. Rynarzewska was someone who "exhibit[ed]

collegial values within [the business school]" and was "an active and enthusiastic

---

[108] According to Dr. Rynarzewska, a normal course load for business school faculty "is a three-three load, totaling six classes for the [academic] year." [Doc. 41-3, Rynarzewska Aff., ¶ 37]. She taught 12 classes in the 2019-2020 academic year because she felt "pressured by Dean Petherbridge to maintain normalcy as much as possible" during COVID-19. [*Id.*]. She also says, notwithstanding her comment in one of her emails about her account being "dead empty," that she "never made [it] clear . . . that [she] sought overloads for . . . additional [compensation] . . . ." [*Id.*]; [Doc. 56-4, p. 15].

[109] [Doc. 35-15, Petherbridge Depo., p. 206:6–24]; [Doc. 56-4, p. 2].

[110] Notably, however, Dr. Rynarzewska points of that "[e]very overload [she] taught had to be approved by a dean." [Doc. 41-3, Rynarzewska Aff., ¶ 37]. In other words, she's arguing that faculty leadership within the business school just should've stopped approving her requests for overloads, if they were so concerned with her quality of teaching.

[111] [Doc. 56-4, p. 2].

[112] [Doc. 35-15, Petherbridge Depo., p. 207:8–11]; *see also* [Doc. 56-4, p. 2 ("Teaching overloads was not done to service" the business school or the university.)].

participant" at business school and university functions.[113] Dean Petherbridge says:

> Dr. Rynarzewska has consistently communicated her lack of support for leadership within [the business school] and upper leadership [at Mercer University]. On a regular basis, I receive emails with complaints from Dr. Rynarzewska. . . . Dr[.] Rynarzewska is disruptive in meetings on a regular basis and complains when asked to do anything unless she is compensated.[114]

Based on her perception of Dr. Rynarzewska, Dean Petherbridge saw her as someone who just had "a very, very, difficult time stepping back [and] let[ting] it go" whenever she didn't agree with or support something—perhaps something like President Underwood's efforts to keep the university open during COVID-19.[115] Right or wrong, it's clear that Dean Petherbridge harbored concerns about Dr. Rynarzewska, but in a nutshell, it was "Dr. Rynarzewska's lack of support for upper university leadership and disruption" within the business school that led her "to not recommend [Dr. Rynarzewska] for tenure and promotion."[116]

Now, if you recall the progression of a tenure application, a letter or recommendation from an associate dean isn't in the formal mix. To be fair, such a letter is neither required nor prohibited. And, here, Associate Dean Crutchfield saw fit to

---

[113] *See* [Doc. 56-2, p. 3], *in connection with* [Doc. 56-4, p. 3].

[114] [Doc. 56-4, p. 3].

[115] [Doc. 35-15, Petherbridge Depo., pp. 214:7—216:5].

[116] [Doc. 56-4, p. 3].

write one.[117] Associate Dean Crutchfield's letter, "regret[tably]" was not a positive

one:[118]

> Dear Provost Davis,
>
> It is with great regret that I must write this letter of concern for Dr. Ania Rynarzewska's application for tenure. Ania has proven over the year and a half that I have led in the associate dean's office that she lacks the leadership skills and commitment to the university or the students. She has proven over and over that she is not a team member and is interested in contributing only in the areas that personally benefit her. It is also a problem for which I have had serious conversations with her.
>
> Dr. Rynarzewska's role should be shifting to one of senior leadership, given that I am now in the associate dean's office. I have been the marketing lead and the AMA club advisor since Steven McClung became the associate dean. When I assumed the role of associate dean, I asked her to lead the [c]ollegiate AMA. She was very upset that I had asked her to do that because it was a role that she "hated" (in her own words). When Lane Wakefield left the university, I asked her to help with the Sports Marketing and Analytics club. Laura Boman, a first-year faculty member who was hired to replace Lane, stepped up and amazingly retained the energy of the club that Lane had built. I have continued to hold full responsibility for leading the marketing club, and she has yet to involve herself with either of the clubs, in spite of several invites.
>
> Dr. Rynarzewska is argumentative when collaborating with leadership and spends her energy complaining about the workload rather than contributing to the school's work. She has yet to make a contribution to school committees in which she has been a team member and has not led one committee.
>
> Dr. Rynarzewska is rude to other members of the Mercer community. She recently called out one of our new admissions staff for not providing the

---

[117] [Doc. 41, p. 12 (Dr. Rynarzewska's argument that Associate Dean Crutchfield "possibly wrote" her recommendation against tenure "at the behest" of Dean Petherbridge)].

[118] [Doc. 56-3, p. 1].

title of Dr. in front of her name in a spreadsheet listing interview teams for one of our scholarship events. Next, she proceeded to email me and our administrative assistant to tell us that she had worked hard for her title and, from now on, to refer to her by her title in formal communications.

Dr. Rynarzewska not only spends a great amount of her Mercer time working on her small business, but [she] also uses a multitude of interns to work for her. This in itself could be a positive experience for the students and personally beneficial to her business, but she perceives this role to be her service to students rather than a personal benefit to her.

It deeply grieves me to take this position in her tenure application because I know the severity of it to her career, but given the long-term impact that tenure has on the school and the university, I cannot in good conscience support her tenure given her attitude and actions in this late transition period.[119]

Sincerely,

Tammy Crutchfield

Dr. Rynarzewska, however, says that Associate Dean Crutchfield's motives in writing this letter to Provost Davis had to be discriminatory—made solely because Dr. Rynarzewska's a woman.[120] Why? Because Dr. Rynarzewska says she can give perfectly valid explanations for each and every thing Associate Dean Crutchfield harps about.

For starters, relying on her annual faculty evaluations, Dr. Rynarzewska says she "had every right to reject AMA leadership as a service obligation."[121] Further, Dr.

---

[119] [*Id.*].

[120] [Doc. 41-2, p. 14]; [Doc. 41-3, Rynarzewska Aff., ¶ 23].

[121] [Doc. 41-2, p. 14 ¶ 66 (citing [Doc. 14-9, pp. 4–9])].

Rynarzewska points out that Dr. McClung led the AMA club until he left Mercer mid-school year in Fall 2019, "meaning Associate Dean Crutchfield only led [it] for [just part of] a semester before asking [her] to lead it" in Spring 2020.[122] Although Dr. Rynarzewska says she "never refused to lead the AMA" but was "pushed out," she did tell Associate Dean Crutchfield that she "felt like [she] wouldn't be the greatest fit" because she would have to sacrifice time spent with students doing research.[123] Aside from time otherwise spent researching with students, Dr. Rynarzewska also conveyed that she wanted AMA club meetings to be during the day rather than the usual 6:00 P.M. time.[124] Understandably, with an evening meeting time, Dr. Rynarzewska had concerns about picking up her children,[125] whereas Associate Dean Crutchfield's concerns were aimed at student preference and availability.[126]

When it comes to the omission of "Dr." in front of her name on a list that was widely disseminated throughout the business school by someone in a separate department, Dr. Rynarzewska says she absolutely "perceived [its] omission . . . as a

---

[122] [Doc. 36-6, Crutchfield Depo., p. 15:4–6]; [Doc. 41, p. 2 (citing [Doc. 37-2, ¶ 10])]; [Doc. 41-4, Gilbert Aff., ¶ 17]; [Doc. 41-2, p. 14 ¶ 65].

[123] [Doc. 37-4, Rynarzewska Depo., pp. 125:13–18; 169:3–7]; [Doc 41-3, Rynarzewska Aff., ¶ 36].

[124] [Doc. 37-4, Rynarzewska Depo., pp. 169:5—170:5].

[125] [Doc. 41-3, Rynarzewska Aff., ¶ 25 ("I specifically hoped to not have to supervise the American Marketing Association Club . . . or to at least move the hours of the meetings to normal business hours so they would not conflict with my childcare responsibilities.")].

[126] [Doc. 37-4, Rynarzewska Depo., p. 169:9–14]; [Doc. 41-3, Rynarzewska Aff., ¶ 25].

gendered issue."[127] So, to address it, Dr. Rynarzewska says that she "privately" emailed

the new admissions staff member to remind her that her name should "also include

'Dr.'" in front of it for formal communications—"Also… I see lots of Dr. In [*sic*] that

table, I should probably have that next to my name as well. Thanks!"[128] Then finally, as

to the quality of internships, Dr. Rynarzewska claims to easily pierce Associate Dean

Crutchfield's comments since Associate Dean Crutchfield "d[id] not know what Ania

had the students do or not do."[129] Associate Dean Crutchfield was clear that she didn't

know the responsibilities Dr. Rynarzewska had for her student interns.[130]

      The Court could go on and on and on with this "nuh-uh, that's not what

happened" banter.[131] It could offer endless commentary about how Dr. Rynarzewska

tries to (and in many instances, does) poke holes in Associate Dean Crutchfield's letter

against tenure. It could also belabor Dr. Rynarzewska's opinion about how Dean

Petherbridge's recommendation was piecemeal and mischaracterized most of what she

---

[127] [Doc. 41-2, p. 17 ¶ 78]; [Doc. 41-3, Rynarzewska Aff., ¶ 39].

[128] [Doc. 41-2, p. 16 ¶¶ 74–75]; [Doc. 41-18, p. 3].

[129] [Doc. 36-6, Crutchfield Depo., p. 136:9–17]; *see also* [Doc. 41-3, Rynarzewska Aff., ¶ 33 ("All of the students learned and received [hands-on] guidance on target market, pricing, positioning, sales, [business-to-business] marketing and supply chain, and finance.")].

[130] [Doc. 36-6, Crutchfield Depo., pp. 136:25—137:2].

[131] *See, e.g.*, [Doc. 41-3, Rynarzewska Aff., ¶¶ 34, 55 (discussing Dr. Rynarezwska's position that she hasn't acted with the negative, complaining, or confrontational nature that Dean Petherbridge and Associate Dean Crutchfield says she has)].

complained about.[132] As tempting as it may be to dive deep into whether what Dr.

Rynarzewska *perceived* as some gender-based jabs were a big deal or how they were

completely trivial, that's not what this case turns on.

To be sure, the record is chock-full of arguments and explanations about email

threads, text messages, letters, and alleged verbal communications on which Dr.

Rynarzewska relies to demonstrate that all of Dean Petherbridge's negative comments

in her recommendation are flat-out false and should've never been used or relied upon

as reasons to deny her tenure. And, on top of that, Dr. Rynarzewska wholeheartedly

believes that all of Associate Dean Crutchfield's unfavorable remarks in her letter are

nothing more than discriminatory efforts to feed misguided information to the ultimate

decisionmaker for her tenure application.

For those of you "in the know" when it comes to employment law, Dr.

Rynarzewska is saying that they're "cat's pawing" her. That's, of course, a term for a

later discussion. For now, though, let's turn to the final step in the tenure-application

process: review by the university president.

It can't be overlooked that Dean Gilbert served as the business school's dean for

most of Dr. Rynarzewska's time at Mercer. When she started teaching for the business

---

[132] While Dean Petherbridge's recommendation to Provost Davis did, in fact, include incomplete email chains, the Court has painstakingly combed through the extra thick record in this case and cobbled together complete email conversations where necessary for review. *Compare, e.g.*, [Doc. 41-26, pp. 2–3], *with* [Doc. 56-4, p. 4].

school in 2013, she did so under Dean Gilbert. When she went through her mid-tenure review in November 2018, Dean Gilbert was still the dean.[133] Dean Petherbridge didn't start serving as dean until July 2019, and about a year later, Dr. Rynarzewska applied for tenure.[134] Naturally, to Dr. Rynarzewska's point, this leads one to maybe question how "informed" Dean Petherbridge's recommendation against tenure could've really been. However, according to President Underwood, that doesn't "necessarily" matter, and it depends on "how engaged [a] dean [is] in the process."[135] To this, President Underwood readily recognized that "it wasn't like Dean Petherbridge was new to the [business school]. She'd been a member of [its] faculty and . . . was quite familiar with [it]."[136] After all, President Underwood observed no difference between the two deans when it came to their levels of engagement within the business school.[137]

Although she doesn't explicitly say this, it's pretty obvious that Dr. Rynarzewska thinks that if Dean Gilbert had been the dean when she went up for tenure—as opposed

---

[133] [Doc. 14-6, p. 14]; [Doc. 37-4, Rynarzewska Depo., pp. 38:16–18; 122:24—123:1]; [Doc. 56-1, p. 1].

[134] [Doc. 35-6, Petherbridge Decl., ¶ 3]; [Doc. 36-6, Crutchfield Depo., p. 15:4–6]; [Doc. 41, p. 2 (citing [Doc. 37-2, ¶ 10])]; [Doc. 41-1, ¶ 24]; [Doc. 41-3, Rynarzewska Aff., ¶ 56].

[135] [Doc. 35-13, Underwood Depo., pp. 39:24—40:8].

[136] [*Id*. at p. 40:8–11]; *see also* [Doc. 41-3, Rynarzewska Aff., ¶ 3].

[137] [Doc. 35-13, Underwood Depo., p. 40:14–17].

to Dean Petherbridge—things would've turned out very different for her.[138] If you recall, tenure appeared to be within easy reach for Dr. Rynarzewska at the time of her mid-tenure review, but what President Underwood focuses most on "is where [applicants] are at the time they're up for tenure."[139] An applicant's mid-tenure review doesn't really factor into President Underwood's decision-making process because "at the time" a professor is "up for tenure," he's "got more pertinent information available."[140]

For example, once President Underwood began to review the emails (exchanged more than a year after Dr. Rynarzewska's mid-tenure review) that Dean Petherbridge attached to her recommendation, he noticed that the email regarding Dr. Rynarzewska's Marketing Analytics class (sent on January 28, 2020) and the one asking her to serve on a committee (sent on January 5, 2020) "reflect[ed] a complaining nature."[141] The Court won't rehash the contents of the email regarding Dr. Rynarzewska's Marketing Analytics class (discussed above), but what's so telling about this other email involving committee service from President Underwood's position? In

---

[138] *See* [Doc. 35-14, Davis Depo., p. 60:11–14 (discussing Dean Gilbert's "very enthusiastic recommendation of Dr. Rynarzewska" when Dean Gilbert "transitioned her files over to Dean Petherbridge")].

[139] [Doc. 35-13, Underwood Depo., p. 39:5–6]; *see, e.g.*, [Doc. 56-1, p. 1].

[140] [Doc. 35-13, Underwood Depo., p. 39:5–14].

[141] [Doc. 14-11, p. 3]; [Doc. 35-13, Underwood Depo., p. 49:18–19]; [Doc. 56-1].

this email, Dean Petherbridge asked Dr. Rynarzewska: "Would you be willing to serve

on [the Hendricks Award Committee]? No pressure. You can say 'No.' I wanted to

check with you. I thought this might be an easy [service element] to list on your tenure

package."[142] The award is given to "a full-time teacher in one of Mercer's twelve schools

and colleges who best exemplifies the qualities that distinguished Joe Hendricks and his

sister, Jean Hendricks, as teachers and mentors to generations of Mercer students[.]"[143]

It recognizes achievement in "challenging and inspiring teaching in and out of the

classroom"; "active engagement of students in the process of learning, discovery, and

leadership"; and "caring mentoring to motivate students to achieve their highest

aspirations and to support junior faculty in becoming exemplary teachers."[144]

      According to the email attached to Dean Petherbridge's recommendation, Dr.

Rynarzewska responded:

> Well[,] since you asked I serve on it, clearly you did not see me as potential
> recipient. I guess I do need to be more chatty and do more high visibility
> things[,] but that equals less work with students. It is a give and take,
> unfortunately. Sure, I will serve.[145]

Based on some conversations with Dean Petherbridge, Dr. Rynarzewska understood

---

[142] [Doc. 56-4, p. 5]; *see also* [Doc. 59-5, p. 1].

[143] [Doc. 59-11, p. 1].

[144] [*Id.*].

[145] [Doc. 56-4, p. 5]; *see also* [Doc. 59-5, p. 1].

that Dean Petherbridge would be nominating her for the award.[146] However, since the Hendricks Award is given to a faculty member who "*support[s] junior faculty*," Dr. Rynarzewska and other junior faculty members weren't eligible to receive it.[147] When Dean Petherbridge emailed Dr. Rynarzewska and asked her to serve on the award's judging committee, it was then she realized that Dean Petherbridge "did not plan to nominate [her]."[148] In defense of her response to Dean Petherbridge's email, Dr. Rynarzewska, having "felt lied to," says it was simply an expression of her "disappointment at not being able to [be nominated] for the award" since she had already lobbied colleagues "to donate their time" by writing letters of recommendation on her behalf.[149]

When asked about these two exchanges—about the emails regarding Dr. Rynarzewska's Marketing Analytics class and the emails about her serving on the committee for the Hendricks Award—President Underwood said, "I mean, my goodness, she's asked to do a very simple committee assignment[,] and the first thing she does is complain about it. . . . The recipients of this award are all very senior, long

---

[146] [Doc. 41-3, Rynarzewska Aff., ¶ 42].

[147] [Doc. 41-27, p. 2]; [Doc. 59-6, p. 1]; [Doc. 59-9, p. 1]; [Doc. 59-10, p. 1]; [Doc. 59-11, p. 11].

[148] [Doc. 41-3, Rynarzewska Aff., ¶ 42].

[149] [*Id.* at ¶¶ 42–43].

time [*sic*], acclaimed professors. No junior professor would ever receive this award."[150]

"[B]eing assigned to the Hendricks . . . Award Committee" is "not a burdensome thing," and "to announce, first of all, you're asking me to do this so I won't get the award"—"that's not a reasonable complaint," according to President Underwood.[151]

"[T]hat's somebody that is so focused on themselves that they cannot even think about the institution."[152] "[E]ven" in the emails about her Marketing Analytics class, President Underwood noted that Dr. Rynarzewska "is complaining about having to meet with [other faculty members] about . . . student complaints."[153] Broadly speaking, in President Underwood's view, Dr. Rynarzewska "seem[ed] unhappy about everything" given that complaint, after complaint, after complaint from and about her plagued the emails that he reviewed.[154]

One last example, sent[155] on February 14, 2020, is this:

Julie and Tammy,
Please understand that this email comes from a place of frustration[,] and, I feel, if I do not voice it now, I will probably hold [it] in forever which is not going to be good for my wellbeing.

---

[150] [Doc. 35-13, Underwood Depo., p. 49:19–25].

[151] [*Id.* at p. 94:12–21].

[152] [*Id.* at p. 94:22–24].

[153] [*Id.* at p. 50:5–7].

[154] [*Id.* at pp. 50:19–20; 51:2].

[155] Note, this would have been in the Spring 2020 semester, and Dr. Rynarzewska submitted her tenure application in the Fall 2020. [Doc. 41-3, Rynarzewska Aff., ¶ 56].

I want to express that [i]t is very disheartening that this is the way I found out about NOT being nominated even after being told that I will be nominated. I made so many people work on it[,] and it feels selfish given how busy everyone is. Next time[,] I really would appreciate openness. Finding out things on an accident (because I saw [another colleague's] nomination [o]n a printer) does not make anyone feel good. There are many examples of finding things out on accidents [*sic*] and, I do realize it, [*sic*] not your fault as you have not been [d]eans for a long time. There are many examples from the past including non-existent maternity leave so I will skip them.

I do not understand why so many things happen so quietly. While salaries are a personal matter, loads are not[,] nor are promised nominations.

Several people must have known about [Lane Wakefield's] load. Lane's [two-two] load had to be okayed by someone. Mid-interview accidental "eureka" moment was certainly a terrible timing. With respect to salary, I was told nobody earns as much as I do within the marketing discipline[,] but then it came around that it is not true.

I would like reiterate [*sic*] our phone conversation. I would like to be matched or exceed our recent Sales tenure[-]track faculty's salary. I would like you to look at his and mine [*sic*] base salary before making final call on the increase. I understand that newer faculty earns more[,] but given how many tens of thousands of dollars less I have been paid over more than half a decade, it should not be a problem.

It is [*sic*] just all really feels unfair given much lower salary, higher load and not being considered for awards.
It all comes out at once[,] and feels like a hit after hit after hit.

While I appreciate you trying to get [me] the research award[,] and I hope I will get it, I will no longer be able to use it on personal computer which broke. It puts constraints I cannot overcome. It also tells me I am not viewed as a candidate worthy of [a] teaching award. However, I still will appreciate the potential research award as I have received much less research support than any most other junior faculty. I will have a student submit a proposal. My concern is… what if the student graduates? Marketing experimental studies take a while. Are there any other grants or research money just for faculty? How about summer research for the second part of summer? I am

at a point where I really would like to feel supported. I have been a team player since the start. I do not plan on changing it[,] but I feel like I do have to look out for myself a little more.

I asked Jim Hunt[,] but he told me to ask you about summer research money.

I hope that with both of you being in charge we can have a culture of openness, fairness (with respect to salaries, workloads and research support)[,] and respect. I know not everyone will always be a winner[,] but knowing that I was not being nominated would have saved me a lot of trouble and time that I don't have while teaching [five] classes, for example.

I am an exceptional scholar, teacher[,] and mentor. Yes, I do it for love[,] but love is not a reward, fair treatment regardless of gender helps to foster that love.

Again, I am writing this from a position of disappointments [*sic*] with things that I have found out on accident that did not feel fair[,] and I hope they will change in the future. After all, [I] would like to recruit new faculty with clear conscience that I am recruiting them into a department where everyone gets treated fairly.

I would like to express that I am looking forward to the future and culture that inspires and motivates faculty like myself. At this minute, I feel a little stunted like I never felt before.

Thank you for reading it[,] and I truly hope you understand where all this comes from[.]

Ania

P.S. I am sorry about your father. I hope he gets better. I would have waited[,] but again I probably would end up keeping it in.[156]

As you've likely deduced by now, President Underwood's decision is all that

---

[156] [Doc. 56-4, pp. 6–7].

matters when it comes to whether a professor receives tenure.[157] Yes, there are, of

course, other recommendations that are considered, but even Dr. Rynarzewska agrees

"that the ultimate decision" rests with President Underwood."[158] As the university's

president, he "award[s] tenure to faculty upon the authority of the Board of Trustees

and with the advice of the [p]rovost and dean of the tenure candidate's school [or

college]."[159] While President Underwood must, per university policy, "act upon the

advice of the dean and the provost,"[160] he's adamant that he's "not a rubber stamp . . .

that [just] appears at the end of the process" when it comes to their advice.[161] President

Underwood's role is substantive, and he is "to exercise [his] own judgment and make a

decision."[162]

---

[157] [Doc. 35-4, Underwood Decl., ¶¶ 4–5]; [Doc. 35-13, Underwood Depo., pp. 14:11—15:18].

[158] [Doc. 37-4, Rynarzewska Depo., p. 89:19–21].

[159] [Doc. 35-4, Underwood Decl., ¶ 4]. Since the P&T Committee's recommendation is "advice *to the dean*" and is "geared primarily *to the dean*[,]" President Underwood isn't required by policy to act on a recommendation from a P&T Committee—"just on the advice of the dean and the provost." [Doc. 35-13, Underwood Depo., p. 18:11–16 (emphasis added)].

[160] You may be wondering: What was Provost Davis' recommendation or advice to President Underwood for Dr. Rynarzewska? Well, first off, the provost's recommendation is not a written one, it's "always" verbal. [Doc. 35-13, Underwood Depo., pp. 16:10–11; 17:1–9]; [Doc. 35-14, Davis Depo., p. 19:1–5]. According to Provost Davis, once he received Dean Petherbridge's letter "that brought up a number of issues" concerning Dr. Rynarzewska he "compile[d] all tenure materials" and presented them to President Underwood. [Doc. 35-5, Davis Decl., ¶ 7]; [Doc. 35-14, Davis Depo., p. 96:9–11]; [Doc. 35-13, Underwood Depo., p. 77:17–22]. "Thereafter, [Provost Davis] met with . . . President Underwood and, after discussion with him, shared [his] verbal recommendation to *not* award [Dr. Rynarzewska] tenure." [Doc. 35-5, Davis Decl., ¶ 7 (emphasis added)].

[161] [Doc. 35-13, Underwood Depo., pp. 18:6–7; 95:14–25].

[162] [*Id*. at pp. 95:14–15; 24–25].

"In recent years," to help him make his decisions, President Underwood started to invite professors seeking tenure to meet with him—an interview, for all accounts and purposes.[163] Dr. Rynarzewska met with President Underwood, and Provost Davis and Dean Petherbridge were also present.[164] As you can imagine, a final opportunity to speak on your own behalf to secure tenure—a job with a lifetime appointment—has to be nerve-racking.[165] So, following a short bout of small talk to put everyone at ease, President Underwood, discusses the process with the candidates and gives them the opportunity to tell him anything that might benefit their application or "something they feel like is not adequately presented in their tenure materials."[166] Not once—Dr. Rynarzewska included—has a professor's tenure "candidacy [been] undermined by [an] interview."[167] After her interview, Dr. Rynarzewska texted Dean Petherbridge: "I hope I didn't blow it[,]" and she replied, "It was a conversation. Today isn't the only thing they take into account."[168]

Finally, what's been brewing for pages and pages has reached its boiling point,

---

[163] [*Id*. at pp. 16:12–16; 16:22—17:4].

[164] [*Id*. at p. 66:2–6].

[165] [*Id*. at p. 93:10–13 ("You're in the process of applying for something unique in the world. Other than federal judges, nobody else has this, and this is a lifetime appointment.")].

[166] [*Id*. at pp. 16:16–21; 66:9–11; 67:10–16].

[167] [*Id*. at p. 66:21–24].

[168] [Doc. 59-34, p. 1].

and we've come to President Underwood's decision for why he denied tenure. Dr.

Rynarzewska first learned of her unsuccessful tenure efforts via Zoom on April 16,

2021,[169] but on May 4, 2021,[170] she learned *why* via letter:

> Dear Dr. Rynarzewska,
>
> This is to inform you that your application for tenure has been denied. The reasons that contributed to this decision were your lack of constructive engagement and participation in group deliberative processes within the [business school], and your failure to demonstrate professional collegiality in the performance of your duties as a member of the faculty.
>
> If you feel that this decision against the award for tenure was based on inadequate consideration, you may petition for review as provided in Section 2.9 of the *University Faculty Handbook*. This petition should be filed with the [p]rovost within thirty (30) days of the date of this letter. Alternatively, if you believe that this decision was based on considerations involving a violation of academic freedom or University policies prohibiting discrimination, you may file a complaint as provided in Section 2.10 of the *University Faculty Handbook*.
>
> Please do not hesitate to reach out to me with any questions.
>
> Sincerely,
>
> Julie Petherbridge[171]

Although President Underwood didn't write this letter, he certainly conveyed his

thoughts to Provost Davis and Dean Petherbridge that he "thought the fourth and fifth

---

[169] [Doc. 59-38, p. 3].

[170] [Doc. 56-5, p. 1]; *see also* [Doc. 59-39, p. 1].

[171] [Doc. 56-5, p. 1]; *see also* [Doc. 59-39, p. 1].

criteria outlined in the tenure policy were not satisfied" by Dr. Rynarzewska.[172] Now,

it's been a while since the Court discussed these criteria, so to save time on flipping

back and searching for them, here's a refresher: Tenure, at Mercer, is first and foremost

"based on merit," and

> is determined in the aggregate with emphasis on the following criteria:
>
> a. Quality of teaching and attention given to students as individuals.
> b. Breadth, depth, and variety of education and experience.
> c. Professional achievement and scholarship.
> d. Responsible participation in group deliberative processes.
> e. Professional responsibility and service to the school and community.[173]

In explaining his reason for denying Dr. Rynarzewska tenure, President

Underwood stated, "we're looking not just to [an applicant's] past, but . . . to the

potential for continued contribution to the university . . . and past conduct can be

evidence of that."[174] It's clear that Dean Petherbridge and Associate Dean Crutchfield

had their thoughts and opinions of Dr. Rynarzewska, input that they felt President

Underwood should be aware of. And, "since [he] do[es] not know the candidate

personally," he has to rely on that input.[175] Importantly, President Underwood found

that "the emails certainly support" Dean Petherbridge's and Associate Dean

---

[172] [Doc. 35-13, Underwood Depo., p. 69:9–15].

[173] [Doc. 56-8, p. 36].

[174] [Doc. 35-13, Underwood Depo., p. 70:16–20].

[175] [*Id*. at p. 88:19–21].

Crutchfield's thoughts and opinions.[176] Associate Dean Crutchfield "talked at length in her letter about her experiences with [Dr. Rynarzewska] and gave examples of what she's talking about. And *some of those examples* are completely consistent with what [President Underwood] saw in the emails."[177] "So[,] [President Underwood] thought it was all together a pretty powerful package[,]" and he was "frankly grateful to [Dr. Rynarzewska] for having exhibited [her] behavior before she received tenure rather than suppressing it until after tenure."[178] In his own words, President Underwood said,

> I think that those emails fully support what [Associate Dean Crutchfield] told the provost in her letter. And I think they fully support what Dean Petherbridge's conclusions communicated to me and the provost in [her] letter. I would never award tenure to someone in these circumstances.
>
> [. . .]
>
> [Dr. Rynarzewska] may have received positive input earlier in the process, but I'm not bound by that. . . . [T]he process contemplates that your behavior and the way you conduct yourself all the way to the end of the process is relevant.[179]

"[I]t was not a difficult to decision" to deny Dr. Rynarzewska tenure.[180]

As you can probably tell, there are droves of communications provided by the

---

[176] [*Id*. at p. 87:16–17].

[177] [*Id*. at p. 87:17–21 (emphasis added)].

[178] [*Id*. at p. 87:21–25].

[179] [*Id*. at pp. 94:24—95:4; 95:25—96:6].

[180] [*Id*. at p. 85:22–23].

parties for the Court to decide this case, but not all of them found their way into this opinion. Most did, but some didn't. Not only would that have been impractical, but a thorough discussion of every single harsh word, of every kind word spoken or exchanged via email, through text message or letter, or whatever it may be simply isn't necessary. To discuss the reasons Dr. Rynarzewska gives to try and explain why she wrote an email the way she did; what she really and truly meant by an email; or what "motivation inspired" some of her responses to Dean Petherbridge, Associate Dean Crutchfield, and others simply misses the forest through the trees.[181] Of course, Dr. Rynarzewska says that everything she did, every email she sent was "to serve the school."[182] Her case, though, doesn't turn on the minutia of inconsequential "He Said, She Said" details or even the possibility that some of her emails may not have come across as she intended. It turns on whether President Underwood denied her tenure because she's a woman.

With the belief that the answer to that inquiry is a resounding "yes," Dr. Rynarzewska sued the university. In her Amended Complaint [Doc. 14], Dr. Rynarzewska relies on protections afforded by federal and state law.[183] In Count One, she alleges that Mercer discriminated against her "because of her sex" in violation of 42

---

[181] [Doc. 41-3, Rynarzewska Aff., ¶ 49].

[182] [*Id.*].

[183] [Doc. 14, ¶¶ 98–113].

U.S.C. § 2000e *et seq.*, what's more commonly known as Title VII of the Civil Rights Act of 1964 ("Title VII").[184] Then, in Counts Two and Three, respectively, she brings a claim under Georgia's Equal Pay for Equal Work Act, O.C.G.A. § 34-5-3,[185] and a state law claim for breach of contract.[186] After a very lengthy and somewhat bumpy discovery period, Mercer filed a Motion for Summary Judgment [Doc. 37] seeking summary dismissal of each claim Dr. Rynarzewska asserts against it. However, this opinion does not address Counts Two and Three because those assert state law claims over which the Court, as explained below, declines to exercise its supplemental jurisdiction based on its ruling with respect to Count One.

## LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four*

---

[184] [*Id.* at ¶¶ 98–103].

[185] Dr. Rynarzewska frequently mentions or discusses the salary she received while teaching at Mercer. However, she never filed a sex-based claim under the Equal Pay Act, 29 U.S.C. 206(d), or any federal claim related to her salary.

[186] [Doc. 14, ¶¶ 104–113].

*Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[187] "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Id.* at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible

---

[187] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

Further, where a party fails to address another party's assertion of fact as required by Rule 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted). Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255. And "if a reasonable

jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

**DISCUSSION**

Let's start with the statute for Dr. Rynarzewska's claim in Count One. Count One alleges a violation of Title VII, which prohibits employers from discriminating against or terminating employees because of their race, color, religion, sex, or national origin.[188] 42 U.S.C. § 2000e(a)(1). Specifically, Dr. Rynarzewska believes that President Underwood denied her tenure because she is a woman. So, because of her sex. No matter the phraseology, employees have multiple theories, or doctrines, or methods of proof at their disposal to survive summary judgment and get their employment discrimination case before a jury.

Wading in a little further, the statute offers employees two theories of discrimination: single-motive and mixed-motive. *McCreight v. AuburnBank*, 117 F.4th 1322, 1330 (11th Cir. 2024). What's most important here is that the chosen theory carries a different standard of causation that an employee must satisfy to show intentional discrimination. *Id.* at 1331. In this case, Dr. Rynarzewska unquestionably rests upon the single-motive theory. Under this theory, an employee "must prove that the 'true reason'

---

[188] *See* n.211, *infra*.

for an adverse action was illegal" bias. *Id.* (quoting *Quigg v. Thomas Cnty. Sch. Dist.*, 814

F.3d 1227, 1235, 1237 (11th Cir. 2016)). Courts look to whether the illegal discrimination

was the but-for cause of the employee's firing. *Id.* (quoting *Hazen Paper Co. v. Biggins*,

507 U.S. 604, 610 (1993)). That is: Did the protected trait have "a determinative

influence" in the employer's decision?[189] *Id.* Applying that standard to this case, Dr.

Rynarzewska must show the "true reason" President Underwood denied her tenure is

that she's a woman. Stated a little differently, she must prove that President

Underwood's "determinative" reason for why she didn't gain tenure came down to her

sex—not the contents of her emails, her behavior, or her myriad of complaints—but her

sex.

Next, when it comes to the doctrines or methods of proof available, proof of

workplace discrimination can be shown through direct evidence, circumstantial

---

[189] For a mixed-motive theory, an employee can argue that a "discriminatory input" "factored into an employer's decision, even if other reasons justified [that decision] as well." *McCreight v. AuburnBank*, 117 F.4th 1322, 1331 (11th Cir. 2024) (quoting *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016)). In other words, "the employee contends that both legal and illegal reasons motivated her firing." *Id.* Under a mixed-motive theory, an employee "need only show that an illegal reason played *a part* in the decision—not that it had a dispositive role." *Id.* (citing *Quigg*, 814 F.3d at 1238, 1241). But, the Eleventh Circuit has made it clear that an employee doesn't get to just "simply allege facts and let the district court figure things out from there." *Id.* at 1332. No, a district court "rel[ies] on the parties to frame the issues" by "advancing the facts and arguments entitling them to relief." *Id.* (citing *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (en banc)). If an employee wishes to "prevail on a particular theory of liability," then she must squarely "present that argument to the district court." *Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011).

In this case, Dr. Rynarzewska never mentioned the phrase "mixed motive" in any of her briefs. Indeed, she has never conceded that President Underwood had any legitimate reasons for denying her tenure. So, by focusing solely on President Underwood's supposed illegal reasons for his decision, she has necessarily limited her case to the single-motive theory and its accompanying but-for causal standard. *McCreight*, 117 F.4th at 1331.

evidence, statistical proof, or a combination of all three.[190] *See Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022). If an employee has—this is, actually *has* evidence that can unequivocally, "without inference or presumption," be pushed into the direct-evidence category—and chooses to prove discrimination through that evidence, then the employer's opportunity to "debunk" what looks like and may very well be an unlawful motive becomes rather limited.[191] *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1156 (11th Cir. 2020); *see Mathews v. Walmart, Inc.*, No. 5:22-cv-00397-TES, 2024 WL 3905815, at *13 (M.D. Ga. Aug. 22, 2024). Thankfully, though, the Court doesn't have to venture into the potentially murky terrain of what happens to an employment discrimination case involving direct evidence because there isn't any in this one. *Compare Thompkins v.*

---

[190] An employee can also establish a prima facie case of class wide discrimination by demonstrating a pattern of discrimination through statistics, but statistics alone cannot make a case of individual disparate treatment. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990); *see also Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir. 1984). "Unless the individual [employee] can point to some specific instance of discrimination, there is no wrong for [a] court to remedy." *Carmichael*, 738 F.2d at 1131. Speaking to the conclusive weight given to a dean's recommendation regarding tenure at Mercer, Dr. Rynarzewska argues that "President Underwood has only once gone against a dean's recommendation out of more than 250 tenure applications." [Doc. 41, p. 7]. To the extent President Underwood's decision to disagree with a dean's recommendation 0.4% of the time can be construed as a statistics-based argument, it is insufficient to prove a pattern of discrimination with respect to Dr. Rynarzewska's sex discrimination claim. *See Carmichael*, 738 F.2d at 1131–32. In any event, the parties do not appear to rely on any specific data analysis or discuss Dr. Rynarzewska's sex discrimination claim through in-depth statistical proof. *See* [Doc. 37-1, p. 14], *in connection with* [Doc. 41, p. 7].

[191] "Where a case of discrimination is proved by direct evidence, [an employer] bears a heavier burden," and the burden-shifting scheme presented by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), has no place in a direct-evidence analysis. *Lee v. Russell Cnty. Bd. of Educ.*, 684 F.2d 769, 774 (11th Cir. 1982); *Ramirez v. Sloss*, 615 F.2d 163, 168 (5th Cir. 1980) ("In the rare situation in which the evidence establishes that an employer openly discriminates against an individual[,] it is not necessary to apply the mechanical formula of *McDonnell Douglas* to establish an inference of intentional discrimination; the showing has already been made directly."). In fact, if direct evidence is present, "it is incorrect to rely on a *McDonnell Douglas* form of rebuttal." *Lee*, 684 F.2d at 774.

*Morris Brown Coll.*, 752 F.2d 558, 564 (11th Cir. 1985) (emphasis added) ("When direct evidence of discrimination has been introduced, the *lower court* must, as an initial matter, specifically state whether or not it believes [the employee's] proffered direct evidence of discrimination."), *with Jones v. Gerwens*, 874 F.2d 1534, 1539 n.8 (11th Cir. 1989) (emphasis added) ("Where a disparate treatment plaintiff has made such a showing, the burden then rests with the employer to convince the *trier of fact* that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor[.]").

If, like here, an employee has only circumstantial evidence to prove discrimination, then employment discrimination cases can branch out in several different ways. From within the ambit of circumstantial evidence, an employee can show proof of intentional discrimination through a burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). She can use the construction of what's known as a "convincing mosaic." *Smith v. Lockheed-Martin Corp.* 644 F.3d 1321, 1328 (11th Cir. 2011). Or, through what is often interwoven into the convincing mosaic, she can use the cat's paw—a subordinate-bias theory where an employer can be liable for the animus of a supervisor who didn't make the ultimate employment decision. *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335 n.6 (11th Cir. 2013).

Employment discrimination cases are far from unique in the fact that they, like countless others, start with a statute that has been subject to judicial interpretation for

now more than half a century. *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 950 (11th Cir. 2023) (Newsom, J., concurring). District courts are intimately familiar with how the methods to prove employment discrimination have been parsed, refined, or even warped over the decades. And, despite what seems like a busy crossroads to prove employment discrimination through circumstantial evidence, each path converges to one simple and ultimate question: "Does the summary-judgment record reveal a genuine dispute of material fact about whether an employer discriminated against its employee 'because of' a protected characteristic?" *Id.* at 954 (Newsom, J., concurring); *McCreight*, 117 F.4th at 1331 (holding that single-motive and mixed-motive theories are analyzed under the same summary-judgment standard: "whether [an employee] has provided sufficient evidence for a reasonable jury to infer intentional discrimination").

### A.   <u>Direct Evidence</u>

Cases in which employees prove discrimination through direct evidence are increasingly rare, but that doesn't mean they don't exist. *Tynes*, 88 F.4th at 950 (citing *Fernandez*, 961 F.3d at 1156). And, what better place to begin the discussion of direct evidence than its definition?

"Direct evidence of discrimination is evidence that 'reflects a discriminatory . . . attitude correlating to the discrimination . . . complained of by the employee' and, 'if believed, proves the existence of a fact without inference or presumption.'" *Fernandez*, 961 F.3d at 1156 (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir.

2004)). In the Eleventh Circuit, direct-evidence cases are reserved for "[o]nly the most

blatant remarks, whose intent could mean nothing other than to discriminate on the

basis of some impermissible factor[.]" *Id.*; *Tynes*, 88 F.4th at 950 (citing *Fernandez*, 961

F.3d at 1156). If the statement in question merely suggests a discriminatory motive, it's

not direct evidence, it's circumstantial. *Fernandez*, 961 F.3d at 1156 (quoting *Wilson*, 376

F.3d at 1086).

Dr. Rynarzewska argues that "[t]here are two pieces of direct evidence" that she

was denied tenure and terminated because she's a woman.[192] First, she contends that

"President Underwood admitted to denying [her] tenure based on her identifying a

gender pay gap" in one of the emails he reviewed provided by Dean Petherbridge.[193]

Second, she says that another professor heard Dean Petherbridge say, "I am dealing

with these Polish girls," while Dr. Rynarzewska was up for tenure.[194] No, and no. These

"two pieces" of Dr. Rynarzewska's case fall well short of direct evidence of any

discrimination.[195]

### 1.    Dr. Rynarzewska's Email from February 14, 2020

What Dr. Rynarzewska contends "President Underwood admitted" at best

---

[192] [Doc. 41, p. 5].

[193] [*Id.*].

[194] [*Id.* at p. 7].

[195] [*Id.* at p. 5].

merely suggests discriminatory motive; thus, it's not direct evidence.[196] *Fernandez*, 961

F.3d at 1156 (quoting *Wilson*, 376 F.3d at 1086). She points to President Underwood's

deposition testimony in which he discusses the criteria considered when reviewing

tenure applications.[197]

> Q:    Okay, I guess, then, what criteria do you look at when you're going
>       through these -- these applications?
>
> A:    I look at the five criteria set out in the policy. Those roughly include
>       the quality of your teaching, the -- the quality of your service, the
>       quality of your scholarship, the quality of your professionalism, and
>       -- and then the -- quality of your interaction with your colleagues.
>       Those aren't the exact words, but I'm sure you have the policy
>       somewhere.[198]

Latching onto the fact that President Underwood found her deficient on "quality of . . .

professionalism" and "quality of . . . interaction with . . . colleagues," Dr. Rynarzewska

presses *that* as direct evidence of sex discrimination arguing that he "explicitly stated he

---

[196] [*Id.*].

[197] [*Id.* (citing [Doc. 35-13, Underwood Depo., p. 30:1–5])].

[198] [Doc. 35-13, Underwood Depo., pp. 29:22—30:7].

chose to deny [her] tenure because of complaints"[199] in her email[200] from February 14, 2020, "contain[ing] overt references to grievances related to sex discrimination."[201]

To this, Mercer points out that Dr. Rynarzewska "provides no citation to [President] Underwood's supposedly 'explicit[]' statement."[202] To be sure, she doesn't, and while that's eyebrow-raising in and of itself, Mercer's position to confront her direct-evidence argument looks to the wrong email. Mercer says when you look at President Underwood's deposition, you'll see that the parts of the emails that jumped out to him—the parts that "influenced his decision"—had nothing to do with any sex-based complaints from Dr. Rynarzewska.[203] For this, Mercer relies on deposition

---

[199] Relying on *Gomez-Perez v. Potter*, Dr. Rynarzewska argues that "complaining" about discrimination and having an adverse employment action taken against you because of that complaint, "is itself sex discrimination." [Doc. 41, p. 6 (citing 553 U.S. 474, 482 (2008))]. She cites *Gomez-Perez* for the proposition that the Supreme Court "[held] in conformity with" the "prohibition of discrimination quite naturally includes discrimination on account of having complained of discrimination," but that reading of *Gomez-Perez* isn't quite right. 553 U.S. at 482. In *Gomez-Perez*, the Supreme Court discussed the prohibition of discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, and looking to 42 U.S.C. § 1981, it concluded the ADEA "quite naturally includes discrimination on account of having complained of discrimination." 553 U.S. at 482. However, the Supreme Court reached that conclusion only because the ADEA, and similarly § 1981, does not contain a standalone retaliation provision. Title VII does. Therefore, an employee proceeding under § 1981 may allege race discrimination based on retaliation, but an employee proceeding under Title VII alone—as Dr. Rynarzewska does in this case— must bring the two distinct claims separately. *See, e.g.*, *Carter v. Luminant Power Servs. Co.*, 714 F.3d 268, 273 (5th Cir. 2013) So, to the extent Dr. Rynarzewska hopes to piggyback what could've been an allegation for a retaliation claim through her arguments concerning direct evidence, she can't.

[200] For reference, this email is the one Dr. Rynarzewska sent on February 14, 2020. [Doc. 56-4, pp. 6–7]; *see also* [Doc. 41-28, pp. 3–4, 5–6 (email produced in duplicate)].

[201] [Doc. 41, pp. 5–6].

[202] [Doc. 50, p. 1].

[203] [*Id.*].

testimony discussing Dr. Rynarzewska's Marketing Analytics class, but again, that's not the email to which Dr. Rynarzewska is referring in support of her direct-evidence arguments. The email in question is the one she sent on February 14, 2020.[204] The line of questioning regarding the email about Dr. Rynarzewska's Marketing Analytics class is as follows:

> Q:    Does anything in this email exhibit lack of support for upper university leadership or disruption of the [business school]?
>
> A.    No.
>
> Q.    Okay. The next page, it says service to the university email at top. What about this one?
>
> A.    I think this reflects a complaining nature, as does the prior. I mean, my goodness, she's asked to do a very simple committee assignment and the first thing she does is complain about it. Clearly, you do not see me as a potential recipient. The recipients of this award are all very senior, long time, acclaimed professors. No junior professor would ever receive this award. I guess I do need to be more chatty. I mean, no, that's -- that's complaining about this assignment.
>
> Q.    Now, is both -- between this email --
>
> A.    I mean, even the previous email is complaining about having to meet with this professor about the student complaints.[205]

Clearly, there's no discussion about any sex-based issues, but when you flip to the portion of President Underwood's email where he's answering questions about the

---

[204] [Doc. 56-4, pp. 6–7]; *see also* [Doc. 41-28, pp. 3–4, 5–6 (email produced in duplicate)].

[205] [Doc. 35-13, Underwood Depo., pp. 49:12—50:7].

email from February 14, 2020, he says:

> A:   *It's full of complaints. She seems very unhappy.*

> Q:   Do you recall, either before receiving this or after receiving this, learning about the -- what precipitated this email?

> A:   I don't recall.

> Q:   Are you able to tell from the text of this email what precipitated it?

> A:   It looks like she has many complaints. *I can't tell for sure which one would have precipitated it. Maybe all of them. She seems unhappy about everything.*

> Q:   I guess, between these three emails that we've reviewed so far, you've stated that there are a lot of complaints. How does that connect, in your mind, to the -- the tenure decision?

> A:   Well, I think I can understand why the dean and the department chair would not believe that she was going to be an effective leader within the school.

> Q:   Who's the -- the department chair?

> A:   Dr. Crutchfield.

> Q:   Oh, okay. Did you think that the attitude exhibited in these emails showed that Dr. Rynarzewska would not have been an effective leader?

> A:   I would not want her working with me, no. I've never had emails like these, that I can recall, sent from a colleague.[206]

Yes, in that email, Dr. Rynarzewska mentioned "salaries," how she wanted to be

"matched or exceed" certain "recent" tenure-track salaries, and "how many tens of

---

[206] [*Id.* at pp. 50:19—51:21 (emphasis added)].

thousands of dollars less" she's been paid for "more than half a decade," but it can't be overlooked that this specific email came "from a place of frustration" about not being nominated for the Hendricks Award.[207] It seems what happened with her Hendrick's Award nomination was the straw that broke the camel's back, but by Dr. Rynarzewska's own words, there's more in play *from just this one* email (not to mention all the others) than just concerns about a pay inequality.

What Dr. Rynarzewska offers as direct evidence requires a thorough understanding of how the countless email exchanges and communications presented above are intertwined together. Once you twist the many inferential and presumptive strings together, you can't take what's now become a rope and thread the tiny needle of what constitutes "blatant," direct evidence. *See Fernandez*, 961 F.3d at 1156 (quoting *Wilson*, 376 F.3d at 1086). It's too much. "This" builds on "that," and "that" has to be looked at in connection with "something else." If the record consisted of just this one email, the Court's analysis might be a little different, but it doesn't. *See Tynes*, 88 F.4th at 954 (11th Cir. 2023) (Newsom, J., concurring). President Underwood's decision to deny Dr. Rynarzewska tenure wasn't because of this *one* email or because of any *one* thing discussed in it. The testimony on which she relies and hangs her direct-evidence hat requires a substantial inferential leap. Thus, it cannot constitute direct evidence. *Fernandez*, 961 F.3d at 1156 (direct evidence is evidence that "proves the existence of

---

[207] [Doc. 56-4, pp. 6–7; *see also* [Doc. 41-28, pp. 3–4, 5–6 (email produced in duplicate)].

[discrimination] without inference or presumption").

President Underwood testified that he "[couldn't] *tell for sure which [complaint] would have precipitated it*. Maybe all of them. She seems unhappy about everything."[208] So, clearly, there's some inference that must be made from this evidence. This isn't a case of, "Oh, had I not mentioned a pay inequality, I would've been awarded tenure." No, there's too much interplay surrounding what Dr. Rynarzewska proffers as direct evidence with respect to President Underwood, and it's about as "indirect" as it gets.

### 2.    Dean Petherbridge's "Polish Girls" Comment

According to Dr. Agnieszka Shepard, one of Dr. Rynarzewska's colleagues, "[she] overheard Dean Petherbridge say, 'I am dealing with these Polish girls,'" during the 2020-2021 academic year.[209] Now, while sophomoric, that alleged statement doesn't constitute direct evidence either. It may squeeze in a sex-plus[210] issue, but it's not direct

---

[208] [Doc. 35-13, Underwood Depo., p. 51:2–5 (emphasis added)].

[209] [Doc. 41-6, Shepard Aff., ¶ 24].

[210] Dr. Rynarzewska argues that "[t]his comment exhibits 'sex-plus' animus." [Doc. 41, p. 7]. "Also cognizable under Title VII are 'sex-plus' discrimination claims." *McCreight*, 117 F.4th at 1330 (citing *Jefferies v. Harris Cnty. Cmty. Action Ass'n*, 615 F.2d 1025, 1033 (5th Cir. 1980)). A sex-plus claim "is a type of employment discrimination claim" an employee can bring "based on one kind of discrimination—sex discrimination—within a particular subgroup of people." *Id.* at 1329. "The 'plus' refers to [non-sex] factors that create the subgroup in which the sex discrimination occurs." *Id.* "Sex discrimination, in short, does not require that an employer discriminate against everyone of a particular sex—Title VII comes into play even when only a subgroup of employees is treated differently based on their sex." *Id.*

evidence.[211]

Again, in the Eleventh Circuit, direct evidence is "evidence, that, if believed, proves the existence of discriminatory intent without inference or presumption." *Robertson v. Riverstone Cmtys., LLC*, 849 F. App'x 795, 801 (11th Cir. 2021) (per curiam) (quoting *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 920 (11th Cir. 2018)). "In applying this definition," the Eleventh Circuit has "marked severe limits for the kind of language to be treated as direct evidence of discrimination." *Id.* (quoting *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998)). Those limits, of course, circle us back to "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of" something protected by Title VII. *Id.* (quoting *Jefferson*, 891 F.3d at 922). Remarks, though, "that are not tied to a challenged employment decision or are made by non-decisionmakers do not qualify under [the

---

[211] Other than this one stray comment, Dr. Rynarzewska never mentioned or even hinted at the notion that Dean Petherbridge recommended against tenure or that President Underwood ultimately denied it because she's a Polish woman. Nowhere in her Amended Complaint nor in the particulars of her Charge of Discrimination to the Equal Employment Opportunity Commission ("EEOC"), does Dr. Rynarzewska ever use or touch on words associated with national origin discrimination. *See generally* [Doc. 14]; [Doc. 14-2]. In her EEOC charge, she says, quite clearly, "I have been employed as a professor at Mercer University in the Eugene W. Stetson School of Business and Economics since 2014 [*sic*]. I believe that I am being discriminated against due to my gender (female) in violation of Title VII of the Civil Rights Act of 1964[.]" [Doc. 14-2, p. 2]. As a plaintiff, Dr. Rynarzewska bears the burden to properly present her claims. *Menzie v. Ann Taylor Retail, Inc.*, 549 F. App'x 891, 896 n.10 (11th Cir. 2013). Other than this single, minute outlier, the parties have conducted themselves as if sex discrimination is the only thing on the table when it comes to Dr. Rynarzewska's Title VII claim. Thus, to the extent she hopes to now include national origin discrimination as part of her case, she cannot. *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (holding that an employee's complaint is "limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination"); *see also Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001).

Eleventh Circuit's] definition of direct evidence." *Id.* (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring in judgment) (finding that "stray remarks in the workplace" or "statements by non-decisionmakers, or statements by decisionmakers unrelated to the decision process" do not qualify as direct evidence)). That said, however, the Court is mindful that an employee can rely on a remark as direct evidence if it is made "by a person somehow involved in, or having an influence on, the decisional process." *Dilla v. West*, 4 F. Supp. 2d 1130, 1137 (M.D. Ala. 1998). Dean Petherbridge obviously and quite easily falls into that category, but—and this is critical—to "constitute direct evidence, the evidence must directly relate in time and subject to the adverse employment action at issue." *Jones v. BE&K Eng'g Co.*, 146 F. App'x 356, 358 (11th Cir. 2005).

We know that Dr. Shepard says she "overheard" Dean Petherbridge say the "Polish girls" comment at some point during the 2020-2021 academic year, but that's the extent of it.[212] There's no evidence that President Underwood's line of thinking matched that of Dean Petherbridge's on the "Polish girls" front, and more importantly, there's no evidence that he even knew about the comment. There just isn't any link, much less a direct link, from Dean Petherbridge's senseless comment to the decisionmaker *or* the tenure decision. *See Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002). Without a narrower window of *when* Dr. Shepard allegedly overheard Dean

---

[212] [Doc. 41-6, Shepard Aff., ¶ 24].

Petherbridge's statement, it's nearly impossible to definitively connect it to the tenure process and decision. *BE&K Eng'g Co.*, 146 F. App'x at 358 ("In order to constitute direct evidence, the evidence must directly relate in time and subject to the adverse employment action at issue."). To get it there, if you can, you must make an inferential leap, and because of that, it's not direct evidence. *Fernandez*, 961 F.3d at 1156 (direct evidence is evidence that "proves the existence of [discrimination] without inference or presumption"). At most, "Polish girls" provides only circumstantial evidence of discriminatory intent. *See Griffith v. DeKalb Cnty. Sch. Dist.*, No. 1:20-CV-4593-MLB-CCB, 2024 WL 4202138, at *8 (N.D. Ga. Jan. 31, 2024); *see also Williamson v. Adventist Health Sys./Sunbelt, Inc.*, 372 F. App'x 936, 940–41 (11th Cir. 2010) (holding that a supervisor's reference to or jokes about an employee's Jamaican heritage did not rise to the level of direct evidence "as the fact-finder would have to infer from these comments that the supervisor's inappropriate racial attitudes motivated her decision to" request that the employee be reassigned).

When you have to start tying bits and pieces of unrelated evidence together, you lose the pearl-clutching shock that accompanies real and true direct evidence. What you have then is, at most, the beginnings of a convincing mosaic. *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("*Lewis II*"). When weaving and tying is your best bet, you don't have direct evidence. Once more, by definition, direct evidence requires no inference, no connection, no relation to another email or some other statement,

nothing at all. It stands alone and can only mean one thing: blatant, unadulterated discrimination. What's in this case surely isn't it. So, there's no direct evidence that Dr. Rynarzewska wasn't promoted to tenure because of her sex.

### B.    Circumstantial Evidence

Although Dr. Rynarzewska can't rely on direct evidence to survive summary judgment, the many branches from with the circumstantial-evidence route are still available to her. *See Jenkins*, 26 F.4th at 1249. As the Court touched on above, when an employee uses circumstantial evidence to support her claims, generally, courts apply the burden-shifting tool that comes from *McDonnell Douglas*. 411 U.S. at 802. Of course, that framework is by no means exclusive, and it's one that this Court enthusiastically supports being "relegate[d] . . . to the sidelines." *Jenkins*, 26 F.4th at 1249–51; *Tynes*, 88 F.4th at 944; *Lee v. Russell Cnty. Bd. of Educ.*, 684 F.2d 769, 773 (11th Cir. 1982); *see also Mathews*, 2024 WL 3905815, at *14 (quoting *Tynes*, 88 F.4th at 958 (Newsom, J., concurring)). Unless and until that day comes, though, parties are free to rely on it as Dr. Rynarzewska has for her case.[213] Thus, the Court must undertake the analysis as well.

### 1.    *McDonnell Douglas* Framework

To begin, Rule 56 and the ordinary summary-judgment standard is where the Eleventh Circuit places its focus for *McDonnell Douglas*. *Tynes*, 88 F.4th at 951 (Newsom,

---

[213] [Doc. 41, pp. 7–16].

J., concurring); *McCreight*, 117 F.4th at 1335. Striving to simplify employment discrimination cases, the Eleventh Circuit stresses that *McDonnell Douglas* and the "convincing mosaic" standard (discussed next) "are two paths to the same destination"—to that ultimate question. *McCreight*, 117 F.4th at 1334–35. "Does the summary-judgment record reveal a genuine dispute of material fact about whether an employer discriminated against its employee 'because of' a protected characteristic?" *Tynes*, 88 F.4th at 954 (Newsom, J., concurring).

### a.    Prima Facie Case

Okay, step one. The initial burden of the framework belongs to the employee who says she's been discriminated against by satisfying a four-part test. *Tynes*, 88 F.4th at 944. The employee can establish a prima facie case[214] of discrimination when she shows that she (1) "belongs to a protected class," that she (2) "was subjected to an adverse employment action," that (3) she "was qualified to perform the job in question," and that (4) her "employer treated 'similarly situated' employees outside her protected class more favorably." *McDonnell Douglas*, 411 U.S. at 802; *Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc) ("*Lewis I*"). The fourth requirement is met when the employee "present[s] evidence of a comparator—someone

---

[214] "'Prima facie case' has a specialized meaning in this context that goes beyond simply producing sufficient evidence to create a jury question; rather, this prima facie case creates a rebuttable presumption of discrimination . . . ." *Lee*, 684 F.2d at 773 (citing *Tex. Dep't of Comm. Affs. v. Burdine*, 450 U.S. 248, 254 n.7 (1981)); *see also Tynes*, 88 F.4th at 944 (citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714–15 (1983) ("The prima facie showing entitles the [employee] to a rebuttable presumption of intentional discrimination.")).

who is 'similarly situated in all material respects.'" *Jenkins*, 26 F.4th at 1249 (quoting

*Lewis I*, 918 F.3d at 1224). The burden shifts if the employee succeeds in making a prima

facie case, and you go to step two. *Lewis I*, 918 F.3d at 1221 (citing *Tex. Dep't of Comm.*

*Affs. v. Burdine*, 450 U.S. 248, 253 (1981)). Step two belongs to the employer. The

employer must articulate a legitimate, nondiscriminatory reason for its actions. *Id.*

Should the employer carry its burden, then the burden reverts to the employee for step

three. *Id.* Step three requires the employee to "demonstrate that the [employer's]

proffered reason was merely a pretext for unlawful discrimination[.]" *Id.*

      Easy stuff first. Dr. Rynarzewska is a woman, so she belongs to a protected

class.[215] Check. She wasn't awarded tenure and was eventually fired from Mercer, so

she suffered an adverse employment action.[216] Check. While Dr. Rynarzewska argues

that she was qualified to become a tenured professor because "she had been eligible to

apply for tenure and was even found to have met the qualifications by the P&T

Committee," Mercer argues[217] she wasn't "qualified under [its] tenure criteria."[218]

---

[215] [Doc. 37-1, pp. 6–8]; [Doc. 41, p. 8].

[216] [Doc. 37-1, pp. 6–8]; [Doc. 41, p. 8].

[217] [Doc. 37-1, p. 6]; [Doc. 41, p. 8].

[218] In support of her prima facie case, Dr. Rynarzewska argues that the University Faculty Handbook criteria that Mercer "claims" President Underwood used in making his decision "are incapable of objective evaluation" and that "subjective criteria have no place in [an employee's] prima facie case." [Doc. 41, p. 8 (first quoting *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 644 (11th Cir. 1998), and then citing *Vessels v. Atlanta Ind. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005))]. Therefore, she argues that the University Faculty Handbook criteria "cannot be relied" on to defeat her prima facie case. [*Id.*].

Nevertheless, since Mercer's evidence on whether Dr. Rynarzewska was qualified "goes to its legitimate, nondiscriminatory reason for not awarding [her] tenure," Mercer assumes "solely for the sake of argument that [she] was qualified for purposes of the *McDonnell Douglas* framework[.]"[219] Easy enough.

Now, let's get into whether Dr. Rynarzewska can show that her "employer treated 'similarly situated' employees outside her protected class more favorably." *Lewis I*, 918 F.3d at 1221. Again, here, we're looking for a comparator, "someone who is 'similarly situated in all material respects.'" *Jenkins*, 26 F.4th at 1249 (quoting *Lewis I*, 918 F.3d at 1224). Of course, whether someone presents as a valid comparator is never cut and dry. So, the Eleventh Circuit provides its direction as to how an employee can produce a comparator. *Lewis I*, 918 F.3d at 1227. Ordinarily, an employee must show that her proffered comparator engaged in the same basic conduct or misconduct; was subject to the same employment policies, guidelines, or rules; was under the same supervisor; and had similar employment or disciplinary histories. *Id.* at 1227–28.

Right now, you may be asking yourself who these "comparators" are. Don't worry, you haven't overlooked them from the Court's lengthy factual narrative. They just haven't been pulled from the wings until now. Dr. Rynarzewska says that she has two comparators, two male professors who "were granted tenure under the same

---

[219] [Doc. 50, p. 3 n.3].

guidelines and same supervisors": Dr. Robi Ragan and Dr. Nik Volkov.[220]

Dr. Ragan received tenure in June 2020.[221] At that time, Dean Petherbridge, Provost Davis, and President Underwood all served in their respective roles.[222] According to Dr. Rynarzewska, Dr. Ragan "frequently argued with leadership in small groups, on email threads that included all faculty, and in faculty meetings" and even considered himself to be "the most 'vocal' faculty member."[223] In support of this, she provides three emails as examples. The first, sent on October 12, 2020 (which is *after* Dr. Ragan received tenure), was in response to an email that Associate Dean Crutchfield sent to all business school faculty about mentoring.[224] Dr. Ragan, replying to Dean Petherbridge only, wrote:

> Julie,
>
> This is completely bonkers on top of everything else we are being asked to do. We are continually being asked to increase our service on committees and in terms of service to the students (mentoring, advising, professional development, and there has been over a 100% increase in other meetings). We need to hire or reallocate resources toward some of these tasks. As it stands[,] research (both our own and with undergrads[)] is being completely crowded out[.][225]

---

[220] [Doc. 41, p. 8].

[221] [Doc. 41-2, p. 9 ¶ 37].

[222] [*Id.* at p. 10 ¶ 38].

[223] [Doc. 41-3, Rynarzewska Aff., ¶ 38].

[224] [Doc. 41-14, pp. 2–3].

[225] [*Id.* at pp. 2–4].

Dean Petherbridge replied:

> Thank you for the feedback. I have not been included on the mentoring[,] so I'm interested in seeing how much time is involved once it is done. We have entirely too many students that are not prepared at graduation. Faculty have mentored for years[,] and the only difference is the requirement to show up.
>
> All of my meetings are optional. Actually[,] last week, I had planned to not have it and was called out by faculty to schedule it.
>
> Committee work this year will be extensive since no work has been done in quite some time. None of the committee work can be done by staff so I'm not sure how I can help with it. Let me know.
>
> Thanks,
>
> Julie[226]

And to that, Dr. Ragan (on October 13, 2020) wrote,

> If putting more and more of the student services and professional development work onto faculty is the only way, then we should expect research productivity and undergraduate research to fall. Because what we are doing now is just not sustainable.
>
> Tenure and tenure-track faculty have research requirements, and as a faculty we have increased those requirements in the past few years. Researching faculty need to be given the time and resources to do that part of their job and to continue to direct undergraduate research. Working with undergraduates on research is extremely time consuming[,] and the work load [*sic*] is not shared equally across faculty.[227]

Again, both emails were sent *after* Dr. Ragan received tenure; thus, they're not at all

---

[226] [*Id.* at p. 2].

[227] [*Id.*].

relevant for how he acted leading up to his tenure recommendation from Dean

Petherbridge.[228] If there are pre-tenure emails from Dr. Ragan to Dean Petherbridge that

are in any way comparable to Dr. Rynarzewska's, they're not on the record. All of Dr.

Rynarzewska's emails obviously predate her tenure decision, and that's a critical

distinction because the only pre-tenure email from Dr. Ragan that's on the record is one

from March 15, 2020.[229] In that email, Dr. Ragan included a news link and wrote:

"Mercer is not responding to press requests about" its COVID-19 plans.[230] Was that

pointed criticism from Dr. Ragan? Perhaps. Still though, as Mercer argues, it's "not at

all similar to the emails [Dr. Rynarzewska] sent."[231]

On top of these emails from Dr. Ragan, Dr. Rynarzewska points to some of his

social media posts on which he gave a good deal of thoughts and commentary about

Mercer's decisions on COVID-19.[232] One, from August 7, 2020, discussed how Mercer's

"plan" regarding masking protocols "does not exactly inspire confidence" and another

included some simple probability data regarding contraction of COVID-19 in the Macon

---

[228] [Doc. 50, p. 5].

[229] [Doc. 41-14, p. 5].

[230] [*Id.*].

[231] [Doc. 50, p. 5].

[232] [Doc. 42-1, pp. 2–5].

area.[233] Another one, from August 13, 2020, discussed how athletics for Fall 2020 were postponed yet Mercer still planned to hold "face-to-face classes."[234] And last, Dr. Rynarzewska points to a social media post which, Dr. Ragan, to be perfectly clear, didn't even write. He just commented on it with a meme from the documentary-style television show, "The Office." The post, aimed at President Underwood's decision to keep the university open during the early days of COVID-19, stated: "Mercer people, decision was changed. Classes cancelled till March 23 with online beginning then." Underneath it, *somebody else* wrote, "The trust in leadership doesn't come back quite so easily. And the lack of respect conveyed can't be undone."[235] And to that, Dr. Ragan commented:


[236]

The Court must, however, stress the obvious. These are social media posts—one

---

[233] [*Id.* at p. 5].

[234] [*Id.* at p. 4].

[235] [*Id.* at p. 3].

[236] [*Id.*].

meme to be technical, not emails that Dr. Ragan sent directly to his boss. Spewing off

thoughts on social-media platforms is a far cry from sending pointed emails directly to

your boss. Plus, Dr. Rynarzewska offered absolutely no evidence that Dean

Petherbridge or President Underwood ever saw anything that Dr. Ragan posted via his

personal social media account.[237] So, it would be improper to classify Dr. Ragan as

"someone who is 'similarly situated in all material respects'" to Dr. Rynarzewska.

*Jenkins*, 26 F.4th at 1249 (quoting *Lewis I*, 918 F.3d at 1224).

What about Dr. Volkov? Dr. Volkov went up for tenure the same year as Dr.

Rynarzewska, and Dean Petherbridge, Provost Davis, and President Underwood were

all involved with his tenure process as well.[238] And, as you've likely assumed, the same

guidelines and procedures that applied to Dr. Rynarzewska applied to Dr. Volkov.[239]

With respect to Dr. Rynarzewska, Dean Petherbridge stated in her letter to Provost

Davis that Dr. Rynarzewska was "disruptive in meetings on a regular basis."[240] On one

occasion, Dean Petherbridge even says that a meeting had to be stopped because of Dr.

---

[237] [Doc. 35-13, Underwood Depo., p. 62:18–22 (Underwood's testimony that he has not "heard of or seen snippets of conversations from a social media platform where faculty are complaining about the school")]; [Doc. 35-15, Petherbridge Depo., pp. 175:1—177:8 (discussing "social media-like platform" different from a personal social media account where faculty emailed about classroom concerns for masking protocols)]; *see, e.g.*, [Doc. 59-26].

[238] [Doc. 35-15, Petherbridge Depo., pp. 42:25—43:1]; [Doc. 41-2, pp. 11–12 ¶¶ 48–49].

[239] [Doc. 35-13, Underwood Depo., p. 68:12–15].

[240] [Doc. 56-4, p. 3].

Rynarzewska.[241] Conversely, while Dr. Rynarzewska says that "[a] meeting was never

stopped because of [her]," she brings up the time Dean Gilbert stopped a meeting in

2015 because of Dr. Volkov to try and lasso him as a comparator.[242] Dr. Volkov

apparently became "so heated" "over disagreements regarding a program" directed by

Dr. Rynarzewska that Dean Gilbert had to "stop that portion of the meeting."[243] Okay,

it's clear that Dr. Rynarzewska and Dr. Volkov might've been disruptive in meetings,

but it's equally clear that we also have two completely different deans presiding over

those meetings. *See Lewis I*, 918 F.3d at 1227–28 (citing *Gerwens*, 874 F.2d at 1541)

(observing that "disciplinary measures undertaken by different supervisors may not be

comparable for purposes of Title VII analysis").

      As Mercer argues, there's no evidence that Dean Petherbridge or President

Underwood were ever aware of how Dr. Volkov acted in 2015.[244] After all, in 2015, Dean

Petherbridge was still an assistant professor, she wasn't even the associate dean on the

business school's Atlanta campus yet.[245] Looking at the evidence, Dr. Volkov only had

"one instance" of "heated" conduct, and it occurred *years* before he was awarded

---

[241] [Doc. 35-15, Petherbridge Depo., p. 218:3–9].

[242] [Doc. 41-3, Rynarzewska Aff., ¶¶ 16, 28].

[243] [*Id.* at ¶ 28].

[244] [Doc. 50, p. 5].

[245] [Doc. 35-6, Petherbridge Decl., ¶ 3]; *see also* [Doc. 41-3, Rynarzewska Aff., ¶ 3].

tenure.[246] From where Dean Petherbridge sat (since becoming dean), Dr. Rynarzewska's disruptive behavior was constant.[247] Dean Petherbridge says that Dr. Rynarzewska "had a very, very difficult time stepping back from her lens to be able to let it go and -- and it just would continue, even to extent after the meetings."[248] Whereas "[m]ost faculty," once they "express[ed] their opinion," "they would let others move on and they didn't bring it back up."[249] These differences are more than enough to pull Dr. Volkov from the "all material respects" label because Dr. Rynarzewska and Dr. Volkov didn't engage in "the same basic conduct or misconduct" or engage in that conduct under the same dean. *Lewis I*, 918 F.3d at 1224, 1226–27; *see also Gerwens*, 874 F.2d at 1541.

Absent a valid comparator, Dr. Rynarzewska cannot show that Mercer "treated 'similarly situated' employees outside her protected class more favorably." *McDonnell Douglas*, 411 U.S. at 802; *Lewis I*, 918 F.3d at 1220–21; *Jenkins*, 26 F.4th at 1249; *Tynes*, 88 F.4th at 944. Unable to make that showing, she fails to state a prima facie case of intentional sex discrimination, and this ends her attempt to prove her case through the *McDonnell Douglas* burden-shifting framework. Now, had Dr. Rynarzewska been able to make a prima facie case of sex discrimination, that wouldn't mean she gets to

---

[246] [Doc. 35-15, Petherbridge Depo., pp. 42:8—43:1]; [Doc. 41-3, Rynarzewska Aff., ¶ 28].

[247] [Doc. 56-4, p. 3].

[248] [Doc. 35-15, Petherbridge Depo., p. 214:1–15].

[249] [*Id*. at p. 214:18–21].

automatically present her case to a jury. Again, the only thing the prima case does is

"entitle[] [the employee] to a *rebuttable presumption* of intentional discrimination." *Tynes*,

88 F.4th at 944 (emphasis added); *see* n.214, *supra.*

b.    *Legitimate, Nondiscriminatory Reason*

Even if the Court got it wrong and Dr. Rynarzewska made a prima facie

showing, Mercer articulated legitimate, nondiscriminatory reasons for denying tenure.

For step two, Mercer's burden of production when it comes to articulating some

legitimate, nondiscriminatory reason, is "exceedingly light." *Lewis I*, 918 F.3d at 1221

(citing *Burdine*, 450 U.S. at 253); *Smith v. Horner*, 839 F.2d 1530, 1537 (11th Cir. 1988).

Mercer takes a rather curtailed route to debunk Dr. Rynarzewska's prima facie case

given that President Underwood has been more than clear that "it was not a difficult to

decision" to deny her tenure.[250]

Mercer argues that President Underwood denied tenure for the legitimate,

nondiscriminatory reasons that Dr. Rynarzewska did not satisfy two criteria for tenured

appointments from the University Faculty Handbook.[251] One last time, these are:

> d. Responsible participation in group deliberative processes.
> e. Professional responsibility and service to the school and community.[252]

---

[250] [Doc. 35-13, Underwood Depo., p. 85:22–23].

[251] [Doc. 37-1, p. 8].

[252] [Doc. 56-8, p. 36].

77

"[I]n evaluating her potential for future contributions" to Mercer, President Underwood concluded that "the evidence was insufficient to show [that Dr. Rynarzewska] would responsibly participate in group deliberative processes and fulfill her responsibility to constructively serve" the business school and university.[253] He says that "[e]vidence of her demeanor and lack of collegiality in interactions with others was instructive" in helping him reach his decision.[254] Remember, Associate Dean Crutchfield noted that Dr. Rynarzewska had "proven over and over that she [was] not a team member and [was] interested in contributing only in the areas that personally benefit[ed] her."[255] Similarly, Dean Petherbridge noted that Dr. Rynarzewska had "consistently communicated her lack of support for leadership within [the business school] and upper leadership [at Mercer]."[256] So, President Underwood says Dr. Rynarzewska's emails—the ones Dean Petherbridge attached to her recommendation—"indicate[d] a strong reluctance to work with student organizations, to do individualized research with students, or to cooperate with colleagues."[257] In his view, "[t]hey were" simply "unprofessional,"[258]

---

[253] [Doc. 35-4, Underwood Decl., ¶ 7].

[254] [*Id.*].

[255] [Doc. 56-3, p. 1].

[256] [Doc. 56-4, p. 3].

[257] [Doc. 35-4, Underwood Decl., ¶ 8].

[258] [*Id.*].

and from Dr. Rynarzewska's own fingertips, she admits in her emails that she "like[s] being up front" and likes taking "the direct route even if it is 'uncomfortable.'"[259] Regardless of whether Dean Petherbridge's recommendation "had been positive," President Underwood says that he "would likely still have decided . . . not to award tenure" based on the emails he reviewed.[260] "[I]n [his] judgment," it "was not a close decision."[261]

With respect to its reasons why it denied Dr. Rynarzewska tenure, Mercer could have more than satisfied its "exceedingly light" burden. *Smith*, 839 F.2d at 1537. It is, after all, merely a burden of production, not one of persuasion—the burden of persuasion remains, at all times, with Dr. Rynarzewska. *Burdine*, 450 U.S. at 255; *E.E.O.C. v. Reichhold Chems., Inc.*, 988 F.2d 1564, 1570 (11th Cir. 1993). Since Mercer could do what is "required of [it]" under the second step of the framework, "whether [Dr. Rynarzewska] really" established a prima facie case "is *no longer relevant*." *Tynes*, 88 F.4th at 945 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)). Put simply, since Mercer could've produced nondiscriminatory reasons for its tenure decision, the inference of discrimination that would've been created by Dr. Rynarzewska's prima facie case "simply drops [from] the picture" as far as the

---

[259] [Doc. 56-4, pp. 20, 23].

[260] [Doc. 35-4, Underwood Decl., ¶ 8].

[261] [*Id*. at ¶ 9]; *see also* [Doc. 35-13, Underwood Depo., p. 85:22–23].

evidentiary tool of *McDonnell Douglas* is concerned. *Tynes*, 88 F.4th at 944–45; *Burdine*, 450 U.S. at 255 & n.10. Now, "the factual inquiry proceeds to a new level of specificity." *Burdine*, 450 U.S. at 255.

*c.     Pretext*

This, of course, brings us to step three: pretext. At step three, Dr. Rynarzewska must try and show "not only that [Mercer's] justification was pretextual, but that the real reason for the employment action was discrimination." *Tynes*, 88 F.4th at 944 (citations omitted). Pretext is simpler than it sounds: It's just Dr. Rynarzewska's assertion that Mercer is lying about why it didn't award her tenure. Put another way, she's arguing that its "reasons" are a cover up for its discrimination. *See Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (en banc). This final piece of the *McDonnell Douglas* framework "merges with [Dr. Rynarzewska's] ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination." *Tynes*, 88 F.4th at 844 (quoting *Lewis I*, 918 F.3d at 1221). See how easy it is for that one ultimate question to sink into the abyss that accompanies employment discrimination cases? Let's refresh: "Does the summary-judgment record reveal a genuine dispute of material fact about whether an employer discriminated against its employee 'because of' a protected characteristic?" *Id.* at 954 (Newsom, J., concurring).

Dr. Rynarzewska may overcome Mercer's asserted nondiscriminatory reasons and push her case past summary judgment either directly by persuading the Court that

80

a discriminatory reason more than likely motivated President Underwood's decision or

indirectly by showing that Mercer's proffered explanations are unworthy of credence.

*Taylor v. Runyon*, 175 F.3d 861, 867 (11th Cir. 1999) (citation omitted). To do so, Dr.

Rynarzewska can point to weaknesses, implausibilities, inconsistencies, incoherencies,

or contradictions in Mercer's proffered nondiscriminatory reasons such that a

reasonable jury might not believe them. *Springer v. Convergys Customer Mgmt. Grp. Inc.*,

509 F.3d 1344, 1348 (11th Cir. 2007). If any of her eight—that's right, eight—arguments

are successful, and if, through them, she can show that "the real reason" she didn't get

tenure is because of her sex, then it'll be up to her to convince a jury that she has been a

victim of intentional sex discrimination. *Tynes*, 88 F.4th at 844 (quoting *Lewis I*, 918 F.3d

at 1221). A word of caution, however, before we embark on Dr. Rynarzewska's pretext

arguments. The focus on pretext, if you're not careful, can shift the emphasis of an

employment discrimination case away from the ultimate question of whether the

employer discriminated against the complaining employee. *Id.* at 954 n.6 (Newsom, J.,

concurring) (quoting Timothy M. Tymkovich, *The Problem with Pretext*, 85 Denv. U. L.

Rev. 503, 528 & nn.189–91 (2008)). If you're wondering what type of case that might be,

you're reading it. Dr. Rynarzewska's pretext arguments throw everything imaginable

against Mercer's nondiscriminatory reasons to try and distract from that one ultimate

question. *See id.*

i.     The University Faculty Handbook Criteria

First, Dr. Rynarzewska contends that if Mercer is so hellbent in arguing that "Responsible participation in group deliberative processes" and "Professional responsibility and service to the school and community" were *why* President Underwood denied tenure, then a fact issue exists as to what those two criteria even mean because, according to her, "[t]hey evade definition based on their plain language."[262] So, what Dr. Rynarzewska is saying is let's have a jury tell us what Mercer's tenure criteria *actually* means, and then, five years hence, once the jury decides the criteria's real meaning, they can then decide if President Underwood violated those previously undefined criteria (which necessarily means that he couldn't have known what they meant either) and intentionally discriminated against her based on sex. No, the criteria are what they are.[263]

Interestingly, before Dr. Rynarzewska even applied for tenure, she says that she "personally had the role of convincing" a collegiate accreditation association during its site visit to Mercer that "the criteria were clear and that if one could meet or exceed the

---

[262] [Doc. 41, p. 9].

[263] Mercer is a private university, and its tenure criteria has been approved by its Board of Trustees. [Doc. 35-4, Underwood Decl., ¶ 4]. For better or worse, President Underwood gets the last word on tenure. Other academics may, of course, criticize Mercer's process, and similarly, Dr. Rynarzewska may not like it either. Thing is, though, she knew the rules before she took the job, and she willingly toiled under those rules for several years. [Doc. 35-13, Underwood Depo., p. 68:12–15].

criteria, one would succeed in obtaining tenure."[264] Yet, Dr. Rynarzewska, since being

denied tenure, now argues that the undefined criteria from the University Faculty

Handbook "are themselves ingredients in the pot to show pretext" in that "subjective

criteria can be a ready vehicle for [sex]-based decisions." [265] *Vessels v. Atlanta Ind. Sch.*

*Sys.*, 408 F.3d 763, 769 (11th Cir. 2005). To be sure, as the Court previously noted,

"subjective evaluations play no part in [an employee's] prima facie case. *Id.*; *see* n.218,

*supra.* "Rather, they are properly articulated as part of the employer's burden to

produce a legitimate [sex]-neutral basis for its decision, then subsequently evaluated as

part of [a] court's pretext inquiry." *Id.* To that, courts should "always look[] upon [such

criteria] with increased scrutiny, particularly in a case such as this where flexibility and

subjectivity" substantially control an employment decision. *Morrison v. Booth*, 763 F.2d

1366, 1374 (11th Cir. 1985). Bear in mind, though, without any "evidence that subjective

hiring criteria were used as a mask for discrimination, the fact that an employer based a

hiring or promotion decision on purely subjective criteria will rarely, if ever, prove

pretext[.]" *Springer*, 509 F.3d at 1349 (quoting *Denney v. City of Albany*, 247 F.3d 1172,

1186 (11th Cir. 2001)).

    To show that Mercer's subjective hiring criteria masks discrimination, Dr.

Rynarzewska sought the help of two expert witnesses. First, Dr. Lynne Richardson

---

[264] [Doc. 41-3, Rynarzewska Aff., ¶ 30].

[265] [Doc. 41, p. 9].

provided opinions regarding whether Mercer should have awarded Dr. Rynarzewska

tenure and whether Dr. Rynarzewska was given fair notice of Dean Petherbridge and

Associate Dean Crutchfield's concerns. Second, Dr. Leanne Dzubinski, opined that

Mercer's decision not to award tenure constituted sex discrimination. Mercer says that

neither opinion is admissible.[266]

"[I]n determining the admissibility of expert testimony under [Federal Rule of

Evidence] 702, [courts] engage in a rigorous three-part inquiry. *United States v. Frazier*,

387 F.3d 1244, 1260 (11th Cir. 2004) (citation omitted). Trial courts must consider

whether:

> (1) the expert is qualified to testify competently regarding the matters [s]he
> intends to address; (2) the methodology by which the expert reaches [her]
> conclusions is sufficiently reliable as determined by the sort of inquiry
> mandated in *Daubert* [*v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)]; and
> (3) the testimony assists the trier of fact, through the application of
> scientific, technical, or specialized expertise, to understand the evidence or
> to determine a fact in issue.

*Id.* Since the Court grants Mercer's summary-judgment motion, there isn't going to be a

trial in this case. Consequently, Mercer's Motion to Exclude Expert Testimony of Dr.

Lynne Richardson [Doc. 35] and its Motion to Exclude Expert Testimony of Dr. Leanne

Dzubinski [Doc. 36] are **DENIED as moot**.

Regardless of what those two experts had to offer Dr. Rynarzewska in support of

her sex discrimination claim, the Eleventh Circuit has "made clear that employment

---

[266] [Doc. 35-1, p. 3]; [Doc. 36-1, p. 3].

decisions may legitimately be based on subjective criteria as long as the criteria are

capable of objective evaluation and are stated with a sufficient degree of particularity."

*E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1281 n.17 (11th Cir. 2000) (citations

omitted). Although Dr. Rynarzewska is sure to disagree that the tenure criteria have

any degree of particularity, it must be remembered that "in the absence of clear

discrimination," courts are generally "reluctant to review the merits of tenure

decisions," recognizing that "scholars are in the best position to make the highly

subjective judgments related [to] the review of scholarship and university service."

*Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 667 (7th Cir. 2007).

### ii.    Shifting Reasons and Suspicious Timing

Second, Dr. Rynarzewska points to Mercer's "shifting reasons" and "suspicious

timing" for its tenure decision.[267] Where an employer fails to articulate clearly and

consistently the reason for an employment decision and instead gives shifting,

inconsistent reasons, there may be evidence of possible pretext. *Hulbert v. St. Mary's*

*Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006); *Edwards v. Tacala Ga. Corp.*, No.

5:21-cv-00219-TES, 2022 WL 5250276, at *8 (M.D. Ga. 2022). "Two layers" of "reasons"

underlie Dr. Rynarzewska's tenure denial, according to her.[268] Just because there may be

"two layers," that doesn't necessarily mean the *reasons* shifted. Nevertheless, the first

---

[267] [Doc. 41, pp. 10–12].

[268] [*Id*. at p. 11].

layer, she says, centers around the start of the appeals process after learning of

President Underwood's decision and the fact that it took Mercer—in her opinion—way

too long to provide a summary of its "ambiguous" reasons so she could try and figure

out what happened.[269] *See Lewis II*, 934 F.3d at 1185 (noting that "ambiguous

statements" may be used to show evidence of discrimination). All she wanted to know

was "what worked against [her]."[270] Truth be told, she claims that "[s]he had to appeal

her tenure decision without knowing what she was appealing."[271]

The second layer, comes from her argument that she'd been kept in the dark

about *why* she didn't receive tenure until *this litigation*.[272] Dr. Rynarzewska says its

"incredibly specious" that she never knew that the "purported reasons" for her tenure

denial stemmed from the emails provided by Dean Petherbridge and certain aspects of

Dean Petherbridge's[273] and Associate Dean Crutchfield's letters *until* President

---

[269] [Doc. 41-24, pp. 2–10].

[270] [Doc. 41-47, 05:36–05:44].

[271] [Doc. 41, p. 11].

[272] [*Id.*].

[273] Recommendations from deans to the provost are typically due by January 31 each year. [Doc. 35-14, Davis Depo., p. 20:4–5]. Although Dean Petherbridge's recommendation regarding Dr. Rynarzewska is dated January 31, 2021, it seems that she may not have actually sent it to Provost Davis until mid-February 2021. *See* [Doc. 35-15 Petherbridge Depo., p. 226:4–24]; *see, e.g.,* [Doc. 54-4, p. 1], *in connection with* [Doc. 41-21, p. 2]. Notwithstanding what Dr. Rynarzewska classifies as "suspicious timing" in hopes of showing some evidence of pretext on her conclusion that Dean Petherbridge "inexplicably backdated" her recommendation against tenure, it's difficult to see how *that* timing can serve as pretext for a tenure decision that hadn't even been made yet. [Doc. 41, p. 12]; [Doc. 41-2, p. 19 ¶¶ 86–88]; *see also* [Doc. 50, p. 10].

Underwood's deposition.[274] Up until then, based on what Dean Petherbridge and

Associate Dean Crutchfield told her, Dr. Rynarzewska thought that her

outspokenness[275] and her social media use[276] hindered her tenure appointment and that

there was a "sudden change in tenure criteria" in that "everything was different than it

used to be coming from [President Underwood's] office."[277] Then, at one point, Dr.

Rynarzewska points out that Dean Petherbridge used undocumented student

complaints as a basis for her recommendation against tenure.[278] And, at another, it

seems that Associate Dean Crutchfield even whispered to Dr. Rynarzewska, "I might be

wrong, okay, but I think I would appeal gender discrimination. But, I might be

wrong."[279]

### iii.    Meeting Mercer's Reasons Head On

Next, Dr. Rynarzewska argues that the nondiscriminatory reasons Mercer

provided are simply false. Where, like here, the proffered reasons "might motivate a

reasonable employer, an employee must meet [those reasons] head on and rebut

---

274 [Doc. 41, pp. 11–12].

275 [Doc. 41-47, 00:05–00:36].

276 [Doc. 41-20, p. 4].

277 [Doc. 41-46, 0:07–0:12].

278 [Doc. 35-15, Petherbridge Depo., p. 196:2–21].

279 [Doc. 41-47, 05:46–06:12].

[them]." *Gogel*, 967 F.3d at 1136 (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc)). Too often employees fail at this third step because they simply either forget or fail to meet their employer's proffered nondiscriminatory reasons head on—that is, to offer evidence that directly contradicts them. Too often they fail to gather the evidence necessary to cast doubt on the proffered reasons, and they cut off their ability to show pretext.

Here, Dr. Rynarzewska asks whether she can really even "rebut [reasons] that keep changing."[280] Still though, in an attempt to do so, she argues that Mercer's opinion that she had a poor interaction with colleagues and the contents of Dean Petherbridge's letter are all false or are "credibility-laden [and] best left to the jury."[281] In attempting to meet Mercer's reasons head on, she offers what she believes is sufficient evidence to rebut the reasons Mercer gave in her tenure denial letter and those stated by Dean Petherbridge.[282]

### A.   <u>Poor Interaction with Colleagues</u>

Regarding her tenure denial letter, you'll recall it stated:

Dear Dr. Rynarzewska,

This is to inform you that your application for tenure has been denied. The reasons that contributed to this decision were your lack of *constructive*

---

[280] [Doc. 41, p. 12].

[281] [*Id.*].

[282] [*Id.*].

> *engagement* and participation in *group deliberative processes* within the
> [business school], and your failure to demonstrate professional *collegiality*
> in the performance of your duties as a member of the faculty.[283]

Dr. Rynarzewska points out that President Underwood paraphrases "group

deliberative processes" "as 'quality of your interactions with your colleagues'" but that

the materials he reviewed "could *only* lead to a conclusion that [Dr. Rynarzewska] had

good interactions with [her colleagues]."[284] Noting that many of her peers and

colleagues "thought highly of her," Dr. Rynarzewska provides a number of examples to

try and chip away at President Underwood's reasoning that her "lack of constructive

engagement and participation in group deliberative processes" provided a lawful basis

to deny her tenure.[285]

Most notably, Dr. Rynarzewska points out that the P&T Committee, which is

made up of her colleagues, unanimously recommended tenure.[286] Then, as you may

expect, she turns to Dean Gilbert who says that "[w]hen collegiality has been mentioned

in past tenure and promotion reports, it has referred to how a faculty member got along

with other faculty members."[287] According to her, "[t]his was not an issue for Dr.

---

[283] [Doc. 56-5, p. 1 (emphasis added)].

[284] [Doc. 41, pp. 12–13 (citing [Doc. 35-13, Underwood Depo., p. 30:4–7])].

[285] [*Id*. at p. 13]; [Doc. 56-5, p. 1].

[286] [Doc. 41, p. 13]; [Doc. 41-17, pp. 2–4]; [Doc. 56-2, pp. 1–3].

[287] [Doc. 41-4, Gilbert Aff., ¶ 11].

Rynarzewska"—she was "very well-liked by her peers, as demonstrated by the

recommendation of those on her [P&T] [C]ommittee."[288] Next, Dr. Rynarzewska turns

to a former colleague who was employed by the business school on the Macon campus

from August 2020 to August 2023 but is now a tenure-track professor at Kennesaw State

University. [289] However, before resigning from her position at Mercer, this colleague got

to know and work with Dr. Rynarzewska.[290] While "'[c]ollegiality' was not

communicated to [her] as a . . . metric for tenure" at Mercer, she says "[e]ven if [it]

was," she "enjoyed working with Dr. Rynarzewska" and that the "general perception

among[] the [business school] faculty was that Dr. Rynarzewska was enjoyable to work

with."[291]

For the most part, it seems that Dr. Rynarzewska may have "exhibit[ed]

collegiality in her interactions" with her colleagues, but at least one of her fellow

professors noticed that "she did not always interact *with the [d]eans* in a collegial

manner."[292] For example, this professor, Dr. Allen Lynch, says that on one occasion he

saw Dr. Rynarzewska "yell at Dean Petherbridge in the break room and . . . abruptly

---

[288] [*Id.*].

[289] [Doc. 41-5, Boman Aff., ¶¶ 3–4].

[290] [*Id.* at ¶ 7].

[291] [*Id.* at ¶¶ 17–18].

[292] [Doc. 35-7, Lynch Decl., ¶ 8 (emphasis added)].

leave."[293] Dr. Rynarzewska, of course, swears she never yelled at anyone or stormed out of rooms because that's "not in [her] nature."[294] Yet, Dr. Lynch says that he has never "observed any faculty member behaving in as disrespectful a manner towards the [d]eans as Dr. Rynarzewska."[295] Dr. Lynch, who sat on Dr. Rynarzewska's P&T Committee, realized she "may have trouble" with her tenure application at the dean's level.[296] However, because he believed the role of the P&T Committee was to review Dr. Rynarzewska's work from their prospective as peers,[297] he decided not to address her lack of collegiality to Dean Petherbridge and Associate Dean Crutchfield.[298] Dr. Lynch says that Dr. Rynarzewska's "unique relationship" with Dean Petherbridge and Associate Dean Crutchfield was outside the purview of the P&T Committee and best captured by them during the next stage of the tenure process.[299]

---

[293] [*Id.* at ¶ 8].

[294] [Doc. 41-3, Rynarzewska Aff., ¶¶ 52, 55].

[295] [Doc. 35-7, Lynch Decl., ¶ 8].

[296] [*Id.* at ¶ 8].

[297] Dr. Rynarzewska makes the argument that the P&T Committee is the only level of the tenure process that provides a review of her through a "colleague 'lens'"—with the rest of the process offering review from administrators. To the extent Dr. Rynarzewska is actually arguing—without a single citation to case law, mind you—that her interactions with Dean Petherbridge and Associate Dean Crutchfield can't be used to show a "failure to demonstrate professional collegiality" because they're deans, such an argument toes the lines of inanity. [Doc. 41, p. 13].

[298] [Doc. 35-7, Lynch Decl., ¶ 8].

[299] [*Id.*].

B.        *Dean Petherbridge's Recommendation*

Now, regarding Dean Petherbridge's recommendation letter to Provost Davis, Dr. Rynarzewska essentially argues that every reason she provides against tenure is unworthy of credence. *Taylor*, 175 F.3d at 867. First, she says that any reliance on student complaints or low teaching evaluations had no place in her tenure denial because Dean Petherbridge said, "You gotta have that one, or you never pushed 'em hard enough."[300] Well, it's clear from the evidence that neither student complaints nor low teaching evaluations had anything to do with why Dr. Rynarzewska didn't receive tenure. In her recommendation, Dean Petherbridge even labeled them as a "minor concern."[301]

Second, Dr. Rynarzewska says that Dean Petherbridge's evaluation of her "service" record and her "engagement" is just completely off base and "erroneous."[302] After all, it must be remembered that the P&T Committee, "by large measure," found Dr. Rynarzewska to "exceed expectations" as early as her mid-tenure review in 2018.[303] Then, again, in its tenure recommendation to Dean Petherbridge in 2020, the P&T Committee noted that Dr. Rynarzewska's service to students was "outstanding" and

---

[300] [Doc. 41, p. 13]; [Doc. 41-41, 00:19–00:26].

[301] [Doc. 56-4, p. 1].

[302] [Doc. 41, pp. 13–15].

[303] [Doc. 56-1, pp. 1–2].

that she "goes beyond" what is requested for service to the business school and the university.[304] While that may be true (well, not maybe, it is true), it also can't be overlooked how much Dr. Rynarzewska had to be encouraged or pushed to engage in service roles akin to those held by senior faculty.[305] Remember that whole ordeal with the AMA club? That's what Mercer relies on for its position that Dr. Rynarzewska never rose to the occasion. Yes, Dr. Rynarzewska says she was "pushed out" of leading the AMA, but at the end of the day, she admitted that she didn't "direct any clubs after [her] mid-tenure review."[306]

Next, scattered within Dr. Rynarzewska's rebuttal efforts against Dean Petherbridge's service- and engagement-related opinions is an argument about how Dean Petherbridge thought, "[a]t first," that some of Dr. Rynarzewska's complaints might've stemmed from a salary issue.[307] To be sure, Dean Petherbridge did mention issues related to Dr. Rynarzewska's base salary in her letter to Provost Davis, but she was equally just as sure to mention that she corrected Dr. Rynarzewska's salary.[308] Still

---

[304] [*Id.*].

[305] *See, e.g.*, [*id.* at p. 2 (The P&T Committee's note that Dr. Rynarzewska "is encouraged to continue to explore leadership opportunities in [the business school] and the university, such as chairing committees [or] directing clubs")].

[306] [Doc. 37-4, Rynarzewska Depo., p. 125:13–18]; [Doc 41-3, Rynarzewska Aff., ¶ 36].

[307] [Doc. 41, p. 14]; [Doc. 56-4, p. 3].

[308] [Doc. 56-4, p. 3].

though, Dean Petherbridge says that Dr. Rynarzewska's "behavior worsened."[309] Dr. Rynarzewska argues that "[t]o use those communications against [her] is itself discriminatory."[310] No, what Dr. Rynarzewska labels as a "gender pay gap," is nothing more than a difference in merit-based accomplishments (accomplishments that Dr. Rynarzewska didn't have) and a difference between two different teaching disciplines within the business school.[311] The "pay gap" had nothing to do with her sex.[312] Moreover, Dean Petherbridge explained that because Dr. Rynarzewska's Ph.D. is a non-business degree that would've also attributed to her making slightly less than professors who held a Ph.D. within a business field.[313]

In short, as President Underwood stated, Dean Petherbridge's conclusions are "fully supported" by the information he received and reviewed.[314] Thus, they're simply not unworthy of credence to show pretext.

And lastly, Dr. Rynarzewska says that Dean Petherbridge's perception of her—that she was disruptive in meetings is "demonstrably untrue."[315] Here, we have another

---

[309] [*Id.*].

[310] [Doc. 41, p. 14].

[311] [Doc. 35-6, Petherbridge Decl., ¶¶ 9, 11]; *see* n.185, *supra*.

[312] [*Id.* at ¶¶ 9–10]; *see also* [Doc. 50, p. 13 n.12].

[313] [Doc. 37-4, Rynarzewska Depo., p. 23:20–24]; [Doc. 35-6, Petherbridge Decl., ¶ 9].

[314] [Doc. 35-13, Underwood Depo., p. 95:1–3].

[315] [Doc. 41, p. 14].

quintessential example of those "He Said, She Said" details that turn up on nearly every corner of the maze that makes up this record. Dr. Rynarzewska says she wasn't ever disruptive,[316] but Dean Petherbridge,[317] Associate Dean Crutchfield, Dr. Lynch from her P&T Committee,[318] and others say she was. In addition to those three individuals, Dr. Briana Stenard, who used to be office neighbors with Dr. Rynarzewska says Dr. Rynarzewska "frequently made comments to [her] that [she] interpreted as critical."[319] More than that, Dr. Stenard says that "the negative environment" that Dr. Rynarzewska created in the workplace was "one of the reasons" she started teaching on the business school's Atlanta campus.[320] And then, there's Ms. Howard, the Mercer Innovation Center's director.[321] Ms. Howard says that Dr. Rynarzewska "frequently became angry when she did not get her way" and "often fired off emails when she was upset."[322]

As the nonmovant, though, Dr. Rynarzewska's evidence is to be believed, and the Court must draw all justifiable inferences in her favor. *Anderson*, 477 U.S. at 255. It cannot pick which side it thinks is more credible. *Sconiers*, 946 F.3d at 1263. But even if

---

[316] [Doc. 41-3, Rynarzewska Aff., ¶¶ 16, 55].

[317] [Doc. 56-4, p. 3].

[318] [Doc. 35-7, Lynch Decl., ¶ 8]; [Doc. 56-3, p. 1].

[319] [Doc. 35-12, Stenard Decl., ¶ 5].

[320] [*Id.*].

[321] [Doc. 35-11, Howard Decl., ¶ 3]; *see also* n.96, *supra*.

[322] [Doc. 35-11, Howard Decl., ¶ 8].

Dr. Rynarzewska wasn't ever disruptive, there are still nondiscriminatory reasons on which President Underwood could, and did, rely for his tenure decision. These, of course, relate to her emails—emails which she concedes were "considered the strongest evidence" President Underwood used against her when it came to her tenure denial.[323]

iv.    Entrapment

When it comes to these emails, however, Dr. Rynarzewska contends they were nothing more than a product of provocation by Dean Petherbridge and Associate Dean Crutchfield.[324] In other words, she argues that she was "entrapped" into creating harmful evidence against herself.[325] *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508 (1993) (noting that where an employer "manufactured" evidence by provoking a certain response from his employee may be considered to discredit the employer's proffered nondiscriminatory reasons). Remember how Dr. Rynarzewska said that Dean Petherbridge and Associate Dean Crutchfield frequently asked her for advice on how to deal with COVID-19?[326] Well, Dr. Rynarzewska says that because Dean Petherbridge "invited some of the material she . . . offered as reasons [for why Dr. Rynarzewska] did

---

[323] [Doc. 41, p. 14].

[324] [*Id*.].

[325] [Doc. 41, pp. 14–15]; [Doc. 41-3, Rynarzewska Aff., ¶ 9].

[326] [Doc. 41-3, Rynarzewska Aff., ¶¶ 9, 16, 47–49].

not deserve tenure," that shouldn't be used against her.[327] She also says that Dean

Petherbridge "invited [her] to be 'disruptive in meetings.'"[328]

To this, Mercer responds with the pretty obvious and simple point that neither

Dean Petherbridge nor Associate Dean Crutchfield asked her to air her concerns about

COVID-19, about student complaints, about *anything* in a "disruptive" and

unprofessional way.[329] Sure, Dr. Rynarzewska might argue that Dean Petherbridge or

Associate Dean Crutchfield simply misunderstood how she meant for an email to come

across. In fact, there *are* several instances where Dr. Rynarzewska takes the opportunity

to explain away what could be perceived as an unprofessional slight in an email.[330]

Even believing that Dr. Rynarzewska only "wanted to convey [certain] sentiments to . . .

serve the [business] school" and university, her assertions of her own good

performance "are insufficient to defeat summary judgment, in the absence of other

[admissible] evidence." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997), *overruled on*

*other grounds by Lewis I*, 918 F.3d at 1220–21. The pretext inquiry "centers upon the

employer's beliefs, and not the employee's own perceptions of [her] performance." *Id.*

While it seems that President Underwood really didn't even care about Dr.

---

[327] [Doc. 41, p. 14].

[328] [*Id.* at pp. 14–15].

[329] [Doc. 50, p. 15].

[330] *See, e.g.*, [Doc. 41-3, Rynarzewska Aff., ¶¶ 48–50].

Rynarzewska's opinions about his efforts to keep the university open during COVID-19,[331] the fact that he relied on Dean Petherbridge's and Associate Dean Crutchfield's perception of Dr. Rynarzewska's emails, cannot demonstrate the necessary pretext to get her sex-discrimination claim to a jury. It must be remembered that the Eleventh Circuit has "repeatedly and emphatically held" that "an employer can generally fire or discipline an employee for 'a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all,' so long as that action 'is not for a discriminatory reason.'" *Tynes*, 88 F.4th at 944 (quoting *Flowers v. Troup Cnty. Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015)).

### v.    Notice of "Problems"

This brings the Court to Dr. Rynarzewska's next point—that she never received notice of her collegiality problems.[332] "According to [Dr. Rynarzewska]," as Mercer phrases her argument, "procedural fairness is central to her claim of sex discrimination."[333] Yes, the Eleventh Circuit has held that an employee's lack of notice that she would be terminated for doing (or not doing) a certain activity *could* lead a jury to conclude that her employer might be fishing for a reason "to fit its desire" to terminate her employment. *Lewis II*, 934 F.3d at 1186. Relying on that holding, Dr.

---

[331] [Doc. 35-13, Underwood Depo., p. 53:15–25].

[332] [Doc. 41, p. 15]; [Doc. 50, p. 15].

[333] [Doc. 50, p. 15 (quoting *Flowers v. Troup Cnty.*, 803 F.3d 1327, 1338 (11th Cir. 2015)) (alteration adopted)].

Rynarzewska contends that because neither Dean Petherbridge nor Associate Dean Crutchfield ever reprimanded or disciplined her with respect to her tone in her emails, to make an issue out of them when she was up for tenure is just more cover up for intentional sex discrimination.[334]

    To combat this, Mercer argues that Dr. Rynarzewska's disrespectful behavior towards Dean Petherbridge and Associate Dean Crutchfield occurred in 2020, just before and leading up to when she submitted her tenure application in Fall 2020.[335] Not quite. Dr. Rynarzewska sent some of what Dean Petherbridge saw as problematic emails months before her last annual evaluation on July 1, 2020.[336] To be fair, Dr. Rynarzewska copied Associate Dean Crutchfield on most of her emails to Dean Petherbridge, so Associate Dean Crutchfield could've mentioned something related to Dr. Rynarzewska's "overall performance" in her annual evaluation from July 1, 2020, but she didn't.[337]

    Still though, Dr. Rynarzewska hasn't shown that Dean Petherbridge or Associate Dean Crutchfield chose to store their dislike for her tone in her emails in their back pockets, just to save them for their recommendations against tenure *because* she's a

---

[334] [Doc. 41, p. 15]; [Doc. 41-3, Rynarzewska Aff., ¶¶ 13–14, 19 (Dr. Rynarzewska inquiring whether she "was . . . causing [a] problem" "called out" by Dean Petherbridge)].

[335] [Doc. 41-3, Rynarzewska Aff., ¶ 56]. [Doc. 50, p. 16].

[336] *See, e.g.,* [Doc. 14-9, p. 4], *in connection with* [Doc. 41-26, pp. 2–3] *and* [Doc. 56-4, pp. 6–11, 14–19].

[337] [Doc. 14-9, p. 4].

woman. And that she must do. *McCreight*, 117 F.4th at 1331 (quoting *Hazen Paper Co.*, 507 U.S. at 610). "Title VII does not allow federal courts to second-guess nondiscriminatory business judgments, nor does it replace employers' notions about fair dealing in the workplace with that of judges." *Flowers*, 803 F.3d at 1338. Without showing that the real reason Dean Petherbridge and Associate Dean Crutchfield withheld the problematic tone of her emails until she applied for tenure was sex discrimination, Dr. Rynarzewska cannot rely on this perceived "unfairness" to demonstrate pretext. *Tynes*, 88 F.4th at 944.

### vi.    Acting Within the Culture of the Business School

Lastly, within the vein of her pretext arguments, Dr. Rynarzewska says she was acting just like everybody else in the business school—acting in accordance with its culture.[338] Turning to President Underwood's statement that he thought "the relationship between the recipient [of an email] and [the] sender" "would matter," Dr. Rynarzewska argues that it's all about "context."[339] Since Dr. Rynarzewska saw Dean Petherbridge and Associate Dean Crutchfield as her friends, she was essentially of the mindset that she had "carte blanche" approval to talk to them however she wanted.[340] The evidence is pretty darn clear that Dr. Rynarzewska had no qualms when it came to

---

[338] [Doc. 41, pp. 15–16].

[339] [Doc. 35-13, Underwood Depo., p. 64:7–14]; [Doc. 41, p. 15].

[340] [Doc. 41-3, Rynarzewska Aff., ¶ 4].

firing off "up front" emails that might make the recipient a little "uncomfortable."[341]

Thing is, though, friends or not, Dean Petherbridge and Associate Dean Crutchfield

obviously took issue with her emails, but there's no evidence that they disapproved of

her less-than-professional conduct because she's a woman.

And yes, even though Dean Petherbridge and Associate Dean Crutchfield asked

for feedback on how to best deal with COVID-19, they didn't, as Mercer has already

argued, ask for that feedback to be given to them in an unprofessional manner.[342] To the

extent Dr. Rynarzewska relies on Dr. Ragan's social media posts about COVID-19 to try

and demonstrate that she was simply acting in line with the business school's culture,

that route, again, is a non-starter.[343] Dr. Ragan voiced his concerns on a personal forum

that wasn't in any way tied to the university. More than that, his comments weren't

ever directly aimed at or sent to Dean Petherbridge or Associate Dean Crutchfield, and

there's no indication that they even knew about them.

Let's assume—for the sake of argument—that other faculty within the business

school complained and had heated discussions in meetings, it can't be forgotten that

one of the faculty members who sat on Dr. Rynarzewska's P&T Committee said that he

had not ever "observed any faculty member behaving in as disrespectful a manner

---

[341] [Doc. 35-11, Howard Decl., ¶ 8]; [Doc. 56-4, pp. 20, 23].

[342] [Doc. 41-3, Rynarzewska Aff., ¶¶ 10, 15, 47–49]; [Doc. 50, pp. 15–16].

[343] [Doc. 41, pp. 15–16].

towards the [d]eans as Dr. Rynarzewska."[344] Even Dr. Ragan, who was "in complete

shock" and "devastated" that Dr. Rynarzewska didn't receive tenure said that although

"faculty were encouraged to give feedback," she "was more outspoken about her

disagreements with administrative decisions or policy than other junior faculty."[345]

Need more? "No one . . . who is still [teaching or working] at Mercer . . . engaged in . . .

behaviors to the same extent as Dr. Rynarzewska."[346] Dean Petherbridge says that "[t]he

manner in which [Dr. Rynarzewska] spoke to [her] was . . . more disrespectful and

argumentative[347] than the manner of any other faculty member [she has] worked with at

Mercer."[348] And, most importantly, because it's his call, President Underwood stated

---

[344] [Doc. 35-7, Lynch Decl., ¶ 8].

[345] [Doc. 35-9, Ragan Decl., ¶ 5]; [Doc. 59-42, p. 2].

[346] [Doc. 35-11, Howard Decl., ¶ 8].

[347] Dr. Rynarzewska argues that "[o]ther circuits" have found that sex stereotypes based on women who have been called "difficult," or "aggressive," or have been told they have a negative attitude, or are being problematic amount to discrimination under Title VII. [Doc. 41, p. 17 (citing *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011))]; *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989). As Mercer points out, Dr. Rynarzewska cites to one case where the Ninth Circuit found that an employee's retaliation claim should survive summary judgment when someone involved in the employee's termination had called her "slut," "bitch", and "whore" after she complained of sex discrimination. [Doc. 41, p. 17 (citing *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1072 (9th Cir. 2003))]; *Stegall*, 350 F.3d at 1063. In *Stegall*, the Ninth Circuit noted that "management repeatedly echoed the all too familiar complaints about assertive, strong women who speak up for themselves: 'difficult,' 'negative attitude,' 'not a team player,' 'problematic[,]'" and it held that "district courts must reject such sexual stereotypes and learn to identify the oft employed rhetoric that could reveal illegitimate motives. 350 F.3d at 1072. The Court agrees with Mercer that the Ninth Circuit only mentioned these gender stereotypes in passing and that *Stegall* does not offer the broad, sweeping proposition for sex-based stereotypes she hopes for. [Doc. 50, p. 17 n.17]. While it's clear that Dr. Rynarzewska relies on *Stegall* for how her colleagues viewed and characterized her demeanor, in no way whatsoever is the evidence from *Stegall* remotely similar to the evidence in this case.

[348] [Doc. 35-6, Petherbridge Decl., ¶ 7].

that he had "never seen communications from a tenure-track faculty member in the last year before applying [for] tenure that indicated a lack of collegiality and inability to constructively serve the [u]niversity to the extent that Dr. Rynarzewska's did."[349]

By all accounts, there is nothing in the record to show that Dr. Rynarzewska can make a prima facie case of sex discrimination, and even if she could, she cannot show that Mercer's "proffered legitimate reasons for its actions [are] unworthy of credence." *Springer*, 509 F.3d at 1348; *Tynes*, 88 F.4th at 946. In short, Dr. Rynarzewska can't create a triable issue through reliance on the *McDonnell Douglas* framework.

However, two more theories remain—the convincing mosaic and the cat's paw. *Jenkins*, 26 F.4th at 1250.

## 2.    Convincing Mosaic

What is it? A "convincing mosaic" is a collection of circumstantial evidence—tiles, if you will—that "is simply enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action." *Tynes*, 88 F.4th at 946. And, although a mosaic is a "collection" of tiles, one tile can be enough to permit a reasonable factfinder to infer discrimination. *Id.* at 955 (Newsom, J., concurring). To assemble a convincing mosaic, an employee can point to evidence that demonstrates "suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred." *Jenkins*, 26 F.4th at 1250 (quoting *Lewis II*, 934 F.3d at 1185). An

---

[349] [Doc. 35-4, Underwood Decl., ¶ 8.]

employee can also point to "systematically better treatment of [similarly situated] employees." *Id.* And, of course, there's always the issue of pretext—that the nondiscriminatory excuse that the employer gave for its decisions and actions is nothing more than a lie to cover up discrimination. *Id.*

Constructing a convincing mosaic "turns on the existence of a genuine factual dispute." *Tynes*, 88 F.4th at 955 (Newsom, J., concurring). This theory is the closest courts can get to mirroring the summary-judgment standard discussed above when it comes to employment discrimination cases. *Id.* at 956 (Newsom, J., concurring). That said, the Court's imminent decision with respect to Dr. Rynarzewska's sex discrimination claim doesn't turn on whether *it's* "convinc[ed]"—the decision comes from nothing more than an evidentiary determination. *Id.* at 956 (Newsom, J., concurring). There isn't a genuine factual dispute in this case that would allow a reasonable jury to find that Mercer discriminated against Dr. Rynarzewska because she is a woman. Let's look at that question one last time: "Does the summary-judgment record reveal a genuine dispute of material fact about whether an employer discriminated against its employee 'because of' a protected characteristic?" *Id.* at 954 (Newsom, J., concurring). No, it does not. With all the evidence before the Court—and it's a lot—the Court is only required to give her justifiable or reasonable inferences and accept her version of facts, not conclusions, as true. *Anderson*, 477 U.S. at 249. It isn't required to assume President Underwood acted with the absolute worst possible

motive when he denied tenure to Dr. Rynarzewska nor must it assume that the only reason he did not do so is because she's a woman. The Court is only required to determine whether there is a genuine issue for trial, and in this case, there isn't one. *Id.*

At this point, there's no sugarcoating the fact that Dr. Rynarzewska hurled every tool at her disposal against Mercer. Notwithstanding this dense, *dense* record, there simply isn't any evidence from which a reasonable jury could infer that President Underwood did not give her tenure because, and only because, she is a woman. In dispensing with every Title VII tool available to her, Dr. Rynarzewska's arguments essentially attempt to shift the Court's role from unbiased arbiter to that of a super personnel department tasked with looking over the shoulders of a decisionmaker. Such a responsibility, though, especially where the record lacks sufficient evidence of unlawful discrimination, has never fallen to the courts—and must not. It's not the role of any court to second-guess employers' business judgments, particularly in the specialized area of academic tenure. *Gogel*, 967 F.3d at 1148 (quoting *Wilson*, 376 F.3d at 1092). As the Seventh Circuit has observed for many years, "tenure cases require something more than mere qualification; the [university president] must believe the candidate has a certain amount of promise." *Adelman-Reyes*, 500 F.3d at 667 (quoting *Sun v. Bd. of Trs. of the Univ. of Ill.*, 473 F.3d 799, 815 (7th Cir. 2007)). "Given the nuanced nature of such decisions," courts generally do not second-guess them. *Id.* The role of the courts is to prevent and remedy unlawful employment practices. *Gogel*, 967 F.3d at 1148

(quoting *Wilson*, 376 F.3d at 1092). "No matter how mistaken" an employee or even a court may think a manager's, an employer's, or a university president's decision may be, Title VII cannot be used to interfere with and upend that decision.[350] *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). Anyone and everyone can second-guess a decisionmaker. People do it all the time, but unless there is evidence that an employer made a decision because of an employee's race, color, religion, sex, or national origin, squabbles between an employee and her employer, as far as Title VII is concerned, have no place in the federal courts. 42 U.S.C. § 2000e(a)(1).

### 3. Cat's Paw

Putting its unique name to the side, under a cat's paw theory of liability, an employee must show that the decisionmaker followed the recommendation of another individual who was motivated by "discriminatory animus." *Adewumi v. Wellstar Med. Grp.*, No. 24-12243, 2025 WL 831584, at *8 (11th Cir. Mar. 17, 2025) (citing *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998)). Simply enough, the theory works to hold an employer liable where the discriminatory animus of a subordinate supervisor—who's not tasked with making the ultimate employment decision—goes unchecked. *Sims*, 704 F.3d at 1335 n.6; *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 419, 422 (2011). However, if "a decisionmaker conducts his own evaluation and makes an

---

[350] The Court isn't offering any opinion regarding President Underwood's decision other than it wasn't discriminatory.

independent decision," then there's nothing holding his decision to the information provided by the biased subordinate supervisor. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001).

Here, if you haven't figured it out already, Dr. Rynarzewska says that Associate Dean Crutchfield is the biased subordinate supervisor and that her recommendation letter to Provost Davis paints the textbook example of cat's paw liability.[351] The Court notes that Mercer's cat's paw argument discusses "the recommendations"—plural.[352] Thus, it's clear that Mercer's argument goes to whether President Underwood made an independent investigation with respect to both Dean Petherbridge's and Associate Dean Crutchfield's recommendations. Dr. Rynarzewska's cat's paw argument, on the other hand, focuses specifically on Associate Dean Crutchfield's recommendation letter.[353] Given the evidence and the overall "theme" of this case, the Court's thinks the better route is to consider how President Underwood examined Associate Dean Crutchfield's recommendation *and* Dean Petherbridge's.

Since it's clear that President Underwood relied on both recommendation letters, whether Dr. Rynarzewska can prevail on the cat's paw theory depends on whether President Underwood made an independent investigation to sever the link between his

---

[351] [Doc. 41, pp. 17–18].

[352] [Doc. 37-1, p. 10].

[353] [Doc. 41, pp. 17–18].

decision and Dean Petherbridge's and Associate Dean Crutchfield's supposedly "biased" (really, illegal sex-based) recommendations. "When the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissive basis, the bias of the subordinate is not relevant." *Pennington*, 261 F.3d at 1270 (citing *Willis v. Marion Cnty. Auditor's Off.*, 118 F.3d 542, 547 (7th Cir. 1997)). To the extent Dean Petherbridge or Associate Dean Crutchfield were biased against someone who saw them as her friends, the evidence easily shows, contrary to Dr. Rynarzewska's assertion, that President Underwood conducted his own independent investigation.[354]

First, President Underwood testified that "the emails" provided by Dean Petherbridge "certainly support[ed] [her] conclusions" about Dr. Rynarzewska.[355] Second, he pointed out that Associate Dean Crutchfield "talked at length in her letter about her experiences with [Dr. Rynarzewska] and gave examples of what she's talking about."[356] And, he was sure to note, that "some of those examples are completely consistent" with what he reviewed from Dr. Rynarzewska's emails.[357] More than just "a

---

[354] [Doc. 41-2, p. 25 ¶ 117) (Dr. Rynarzewska's position that President Underwood "cherry-picked emails" and did not even perform a *de minimis* investigation of Dean Petherbridge's or Associate Dean Crutchfield's allegations against her)]; [Doc. 41-3, Rynarzewska Aff., ¶ 4].

[355] [Doc. 35-13, Underwood Depo., pp. 87:16–17, 90:13–14 (President Underwood's testimony that he didn't think Dean Petherbridge was "trying to mislead [him] in any respect")].

[356] [*Id.* at p. 87:17–19].

[357] [*Id.* at p. 87:20–21].

rubber stamp . . . that appears at the end of the [tenure] process," how can President Underwood's decision still be connected to some perceived bias from Dean Petherbridge or Associate Dean Crutchfield when he swore under penalty of perjury that he likely still would've denied tenure after reviewing Dr. Rynarzewska's emails "[e]ven if" they would've given positive recommendations?[358] *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). That President Underwood independently found Dr. Rynarzewska's emails to "fully support the judgment[s]" from Dean Petherbridge or Associate Dean Crutchfield completely destroys any cat's paw liability.[359]

As you're well aware, Dr. Rynarzewska offered a lot of circumstantial evidence in this case. Conversely, there is just as much evidence provided by Mercer to support why Dr. Rynarzewska wasn't awarded tenure. There is sincere, *good* evidence that Dr. Rynarzewska is an accomplished scholar and educator, but there is also evidence that she should've conducted herself more professionally while teaching at Mercer. However, even when you believe all of Dr. Rynarzewska's evidence, her points of view, her explanations, and every tick and tack of her reasoning, and stack all of it alongside what Mercer offers, it's this Court's opinion that the record does not reveal a genuine dispute of material fact about whether President Underwood denied her tenure and

---

[358] [Doc. 35-4, Underwood Decl., ¶ 9]; [Doc. 35-13, Underwood Depo., p. 95:21–24].

[359] [Doc. 35-4, Underwood Decl., ¶ 9].

illegally discriminated against her *because* she's a woman. *Anderson*, 477 U.S. at 255; *Tynes*, 88 F.4th at 954 (Newsom, J., concurring); *McCreight*, 117 F.4th at 1331. Dr. Rynarzewska's "evidence is simply too weak" to permit a reasonable factfinder to conclude that the reasons for which she was denied tenure—her lack of participation in group deliberative processes and her lack of professional responsibility and service to the school and university—were just covers for sex discrimination. *See Adelman-Reyes*, 500 F.3d at 667.

## CONCLUSION

The Court's opinion in this case has admittedly been far from brief. In large part, this lengthy opinion stems from Dr. Rynarzewska's pursuit of every conceivable route or theory to try to make her case for intentional sex discrimination. And, the Court gets it. Those of us who have ever been passed over for a job or promotion for which we worked hard and sincerely felt we deserved know all too well the raw hurt such disappointment causes. There's not a doubt in the Court's mind that when she learned Mercer had denied her tenure that she and some of her colleagues were in "complete shock."[360] Rest assured, the Court understands Dr. Rynarzewska's resulting frustration and anger over the tenure decision and her legal assault on the process that led to what she perceives as such an egregious wrong.

But—at the end of the day—the final decision rests with President Underwood,

---

[360] [Doc. 37-4, Rynarzewska Depo., pp. 86:18; 88:9–10]; [Doc. 59-42, p. 2].

and the only thing this Court is concerned with is whether he denied her tenure because of her sex. Here, there just isn't any evidence that he did. Remember, at summary judgment, the nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen*, 121 F.3d at 646.

Bottom line: President Underwood independently reviewed what Dean Petherbridge and Associate Dean Crutchfield gave to him. Then, rather than relying on Dr. Rynarzewska's many past accomplishments, he considered what the future might look like if he chose to give her tenure. As he saw it, Mercer's best interests would be served if he chose to protect the university from what he concluded was Dr. Rynarzewska's non-collegial behavior—behavior that he felt would only worsen when insulated by the independence and permanency that comes from the award of tenure.[361] In short, he thought she lacked promise. *See Adelman-Reyes*, 500 F.3d at 667. Whether President Underwood placed too much emphasis on her pre-tenure conduct isn't relevant to the Court in this discrimination case. Whether President Underwood shouldn't have considered Dr. Rynarzewska's emails as harshly as he did doesn't matter either. And, whether Dr. Rynarzewska could ultimately prove that she deserved

---

[361] [Doc. 35-13, Underwood Depo., p. 87:11–25].

tenure has no bearing on the outcome of this case.

All that matters is whether President Underwood made his ultimate determination on tenure because of her sex. There just isn't any evidence that Dr. Rynarzewska's sex had anything to do with his decision. So, it's no place for a federal court to second-guess the university president. *Flowers*, 803 F.3d at 1338.

The Court **DENIES as moot** Mercer's Motion to Exclude Expert Testimony of Dr. Lynne Richardson [Doc. 35] and its Motion to Exclude Expert Testimony of Dr. Leanne Dzubinski [Doc. 36] and **GRANTS** its Motion for Summary Judgment [Doc. 37] with respect to Count One of Dr. Rynarzewska's Amended Complaint. Having disposed of her only federal claim,[362] only state law claims remain, and the Court is not required to decide them.[363]

Federal courts may exercise supplemental jurisdiction over state law claims "in any civil action of which [they] have original jurisdiction." 28 U.S.C. § 1367(a). "[D]istrict courts may," however, "decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[S]tate courts, not federal courts, should be the final arbiters of state law," and when a federal court "has dismissed all federal claims

---

[362] In her Amended Complaint, Dr. Rynarzewska, in passing, mentions damages pursuant to 42 U.S.C. § 1981a(a)(1). [Doc. 14, ¶ 117]. However, § 1981 only covers race-based discrimination "in the making and enforcement of private contracts," not sex-based discrimination. *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013); *Runyon v. McCrary*, 427 U.S. 160, 168 (1976).

[363] [Doc. 14, ¶¶ 104–113].

from a case, there is a very strong argument for dismissal, especially where the federal claims are dismissed prior to trial." *Ingram v. Sch. Bd. of Miami-Dade Cnty.*, 167 F. App'x 107, 108 (11th Cir. 2006) (quoting *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997)). "[D]istrict courts may not exercise jurisdiction absent a statutory basis." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005).

Recognizing this hard-and-fast rule, the Court declines to exercise supplementary jurisdiction over Dr. Rynarzewska's remaining state law claims against Mercer in accordance with the considerable discretion afforded to it by § 1367(c)(3). The Court, therefore, **DISMISSES** Dr. Rynarzewska's claim under Georgia's Equal Pay for Equal Work Act, O.C.G.A. § 34-5-3, and her claim for breach of contract **without prejudice**.[364] The Court **DIRECTS** the Clerk of Court to **ENTER** Judgment in Mercer University's favor and **CLOSE** this case.

**SO ORDERED**, this 10th day of April, 2025.

S/ *Tilman E. Self, III*
**TILMAN E. SELF, III**
**UNITED STATES DISTRICT COURT**

---

[364] [Doc. 14, ¶¶ 104–113].